3 F.3d 167
 62 USLW 2132, 17 Employee Benefits Ca 1409
 CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
et al., Plaintiffs-Appellants,
v.
NAVCO and William L. Caldwell, III, Defendants-Appellees.
CHICAGO TRUCK DRIVERS, HELPERS AND WAREHOUSE WORKERS UNION
(INDEPENDENT) PENSION FUND, et al., Plaintiffs-Appellants,
v.
NAVCO and William L. Caldwell, III, Defendants-Appellees.
 Nos. 92-1968, 92-2295 and 92-2923.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 19, 1993.
Decided Aug. 9, 1993.
Rehearing and Suggestion for Rehearing En
Banc Denied Sept. 20, 1993.
 
 Terence G. Craig (argued), Central States, Southeast & Southwest Area Pension Fund, Law Dept., Rosemont, IL, David A. Sawyer, Russell N. Luplow, and David Machnacki, Russell N. Luplow, P.C., Bloomfield Hills, MI, and Joseph M. Burns, and David S. Allen (argued), Jacobs, Burns, Sugarman & Orlove, Chicago, IL, for plaintiffs-appellants.
 Edward T. Joyce, Paul A. Castiglione, Richard S. Reizen (argued) and Deborah I. Prawiec, Kubasiak, Cremieux & Fylstra, Chicago, IL, for defendants-appellees.
 Before BAUER, Chief Judge, and COFFEY and EASTERBROOK, Circuit Judges.
 EASTERBROOK, Circuit Judge.
 
 
 1
 During the fall of 1983 United States Bedding Company and The Englander Company filed petitions in bankruptcy. Both firms had been making contributions to multiemployer pension plans; they completely withdrew from these plans in January 1984. The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) permits an underfunded multiemployer pension plan to pursue a withdrawing employer for a portion of the plan's deficit. 29 U.S.C. Sec. 1381. The plans assessed withdrawal liability aggregating $672,000. Despite some success in marshaling assets in bankruptcy, In re United States Bedding Co., 52 B.R. 875 (Bankr.C.D.Cal.1985), the employers have not satisfied any portion of their withdrawal liability.
 
 
 2
 The MPPAA provides that all members of a group under "common control" are liable for each other's withdrawal liability. 29 U.S.C. Sec. 1301(b)(1). Both of the withdrawing firms were part of a corporate group under the umbrella of Van Vorst Industries, Incorporated. Van Vorst itself was a dry well, as were other corporate members of its family. The two pension funds believe that Navco, a partnership, also belonged to the Van Vorst group. Both funds filed suit against Navco and William L. Caldwell, its general partner (collectively Navco). Navco has invoked the statute of limitations in 29 U.S.C. Sec. 1451(f):
 
 
 3
 An action under this section may not be brought after the later of--
 
 
 4
 (1) 6 years after the date on which the cause of action arose, or(2) 3 years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action; except that in the case of fraud or concealment, such action may be brought not later than 6 years after the date of discovery of the existence of such cause of action.
 
 
 5
 Van Vorst and its affiliates withdrew early in 1984, yet one fund did not commence suit until 1991, and the other waited until 1992. Both suits came substantially more than six years after the withdrawals.
 
 
 6
 The suit by the Central States, Southeast and Southwest Areas Pension Fund (the Teamsters Fund) was assigned to Judge Grady. The pertinent dates are these. The employers finally withdrew by January 1984. On November 3, 1983, and again on March 14, 1984, the Teamsters Fund sent letters demanding that the employers identify other members of their corporate groups. See 29 U.S.C. Sec. 1399(a). No replies were forthcoming. On April 6, 1984, the Teamsters Fund sent a formal notice of withdrawal liability and a demand for payment. The employers were supposed to pay immediately but had 60 days to "cure" any nonpayment. 29 U.S.C. Sec. 1399(c)(2). That time expired on June 5, 1984. The Teamsters Fund filed its suit against Navco and Caldwell on May 1, 1991. Caldwell had been listed in the bankruptcy schedules as an equity investor in the employers. The Teamsters Fund claims that it did not discover Navco's existence until sometime during 1990; the Fund does not explain how Navco came to its attention. Judge Grady granted summary judgment for the defendants. He held that the suit is untimely under Sec. 1451(f) because the claim accrued on June 5, 1984, when payment became delinquent, rather than when the Teamsters Fund discovered Navco's existence.
 
 
 7
 The suit by the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund (the Independent Fund) was assigned to Judge Plunkett. The sequence is slightly different. The Independent Fund sent the employers a notice and demand on June 19, 1984, specifying a schedule of payments. The first payment was due on July 1, 1984, and additional payments were to be made each quarter through July 1, 1986. Not a cent was remitted in 1984 or at any later time. On August 28, 1990, the Independent Fund sent a letter to an attorney who had filed an appearance for U.S. Bedding in the bankruptcy action, asking for copies of the schedules filed in that case, a list of all equity investors in the firm, and "any information which indicates that these equity security holders owned any other corporation, partnership or sole proprietorship." No reply was forthcoming. The Independent Fund filed suit on March 13, 1992. It has not explained when or how it learned of Navco's existence. Like Judge Grady, Judge Plunkett granted summary judgment for the defendants. 800 F.Supp. 587 (N.D.Ill.1992). Judge Plunkett concluded that the claim accrued on July 1, 1984, when the first payment was due, rather than quarterly as additional payments came due. The Independent Fund argued (as the Teamsters Fund had not) that the employers' failure to provide information about the control group tolled the statute of limitations. Judge Plunkett rejected this argument because, he held, the time limit established in Sec. 1451(f) is a "jurisdictional" bar that may not be extended.
 
 
 8
 We have consolidated the pension plans' appeals from these decisions. Although we expressed concern at oral argument about appellate jurisdiction in the Independent Fund's case, study of the record has dispelled our worries. All claims against the four original defendants (Van Vorst and Elgea I, Inc., in addition to Navco and Caldwell) have been wrapped up (Van Vorst for lack of service, Elgea by default judgment), making the disposition final and appealable under 28 U.S.C. Sec. 1291. By and large, we treat the appeals as if there were only one employer and one fund making a single argument. We consider all of the arguments both funds present; details about which pension plan presented which argument are unimportant.
 
 
 9
 Both district judges concluded that the "cause of action arose" for purposes of Sec. 1451(f) when the employers' debts to the pension plan became overdue, see Joyce v. Clyde Sandoz Masonry, 871 F.2d 1119, 1124 (D.C.Cir.1989), rather than when they discovered the identity of persons who might be required to satisfy those debts. As soon as the 60-day grace period provided by Sec. 1399(c)(2) expired, the funds could have commenced suit. They had been injured. That is the standard definition of the "accrual" of a claim.
 
 
 10
 Section 1451(f)(2) states a "discovery" rule, and a claim accrues under a discovery rule when the victim knows of his injury. The time begins even though the victim does not know that the injury is actionable. E.g., United States v. Kubrick, 444 U.S. 111, 119-22, 100 S.Ct. 352, 358-60, 62 L.Ed.2d 259 (1979); McCool v. Strata Oil Co., 972 F.2d 1452, 1465 (7th Cir.1992); Cada v. Baxter Healthcare Corp., 920 F.2d 446, 450 (7th Cir.1990). If a claim accrues even though the victim does not know that he has a legal entitlement to recover, the fact that the victim does not know who would be the right defendant cannot matter. Consider negligent medical treatment, the subject of Kubrick. The Court held that the patient's claim accrued when he learned that he had been injured by a drug administered to him, even though he did not know that the use of this drug was negligent. Under the circumstances, the victim's observation that he did not know which physician had prescribed or administered the drug could not have mattered. Or consider an accident in a state that permits actions directly against an insurer. Driver D runs down pedestrian P, who believes D destitute. Does P 's neglect to learn the identity of D 's insurer extend indefinitely the time to commence an action against that insurer? Finally consider what is perhaps the closest analogy: a shell corporation C, operated by shareholder S without observing the corporate forms, defrauds victim V. Correctly believing that C is insolvent, V does not explore the possibility of piercing the corporate veil. Does V 's neglect extend the time to make a claim against S ? We could not find any case so holding. Plenty of cases reject contentions that particular claims do not accrue until the victim finds out who can be obliged to pay. E.g., Lundblad v. Celeste, 874 F.2d 1097, 1104 (6th Cir.1989), modified on other grounds, 924 F.2d 627 (1991) (in banc); Dyniewicz v. United States, 742 F.2d 484, 486 (9th Cir.1984); McDaniel v. Johns-Manville Sales Corp., 542 F.Supp. 716, 718 (N.D.Ill.1982). Only one case, Fitzgerald v. Seamans, 553 F.2d 220, 229 (D.C.Cir.1977), looks in the opposite direction, and that opinion relies on the doctrine of equitable tolling, a subject distinct from the time the claim accrues. We discuss equitable tolling below.
 
 
 11
 Six years from the time of the injury, which Sec. 1451(f)(1) affords as the minimum in every case, is generous. Congress appreciated that it might be difficult to ascertain the existence of a claim and track down persons liable under the Employee Retirement Income Security Act, a complex statute. (The MPPAA is an amendment to ERISA; Sec. 1451 applies to all of ERISA.) Pension funds and other persons holding claims under ERISA can use that six years to investigate. And if the potentially liable person engages in fraud or concealment, then Sec. 1451(f)(2) affords six years from the discovery of the injury. The pension funds in our case, however, see the six years as a period of rest and recuperation. Only after knowing that they have not been paid, and recognizing who is liable, does the six years even start, the funds say. Yet if the time does not begin until the fund knows everything it needs to know--the existence of the debt, nonpayment, and the identity (and relation to the employer) of control group members--why is the period so long? Statutes of limitations provide time within which a person who knows of an injury may conduct the investigation needed to learn whether he has a legal claim and, if so, who is liable. After completing the investigation, a pension fund should be able to make a demand (and, if necessary, file suit) in a matter of weeks. Allowing six years is understandable only on the assumption that the time was to be used to search for vital information. Both pension funds had ample time to explore questions about the Van Vorst corporate structure. They chose not to investigate and may not now insist that their own diffidence meant that the time did not even commence.
 
 
 12
 Any other approach would make the statute of limitations illusory. For it is not enough to know that a person slinks about in the background. Caldwell, after all, was identified in the bankruptcy filings as an investor, and the pension funds say that this was meaningless. In order to show that a person is liable as an "employer" by being involved in a control group, the funds must establish that the person actually controlled the trade or business in which the withdrawing firm was engaged. This can be a difficult task, as many recent cases in this circuit show. Central States Pension Fund v. Johnson, 991 F.2d 387 (7th Cir.1993); Central States Pension Fund v. Ditello, 974 F.2d 887 (7th Cir.1992); Central States Pension Fund v. Personnel, Inc., 974 F.2d 789 (7th Cir.1992); Central States Pension Fund v. Koder, 969 F.2d 451 (7th Cir.1992); Central States Pension Fund v. Slotky, 956 F.2d 1369 (7th Cir.1992). The implication of the pension funds' argument is that the time would not even commence until all ancillary questions about the scope of control and the nature of the business have been resolved. Doing the research on these questions is what the six years are for, and we therefore hold that the claim accrues as soon as payment becomes overdue.
 
 
 13
 What, then, of the possibility that payment can become overdue frequently? The Independent Fund set a quarterly schedule, and the last payment was not due until July 1, 1986. The Independent Fund filed suit within six years of that date. Judge Plunkett concluded that a pension fund's power to accelerate future installments once the employer misses a payment, 29 U.S.C. Sec. 1399(c)(5); 29 C.F.R. Sec. 2644.4, means that the whole sum becomes due, and the whole claim accrues, when the first payment is missed. This is the right conclusion, but we put it somewhat differently. The pension fund had only one claim against the employer (and, derivatively, against the controlling persons): the amount of withdrawal liability. Although a fund may permit an employer to amortize this sum over 20 years, 29 U.S.C. Sec. 1399(c)(1)(B), the whole amount is presumptively due at the outset. Section 1391 calls on the pension plan to determine an amount that is owed; the financing options under Sec. 1399(c) do not break this single debt into little pieces with their own statutes of limitations.
 
 
 14
 Suppose a pension fund, dissatisfied with our conclusion that it has "only" six years to track down members of control groups, decides to grant itself additional time. If each overdue payment starts a new six-year period, the pension fund could decelerate payment on default--say, converting from a two-year schedule (which the Independent Fund selected) to a twenty-year schedule. Extra time cannot harm the fund, given that an insolvent employer will not pay on any schedule. Then once it locates what it believes is a member of the control group, the fund may demand payment of the current installment and, when this is not forthcoming, accelerate all future payments under Sec. 1399(c)(5) and file suit. Clever, but it ought not work. Turning six years into twenty-six is a job best left to magicians. Statutes of limitations serve vital social interests--the usual ones of preventing stale claims that may be hard to prove, and protecting the interest of potential defendants in knowing their liabilities, and in the MPPAA the unusual one of protecting the beneficiaries of the fund. Congress told the trustees of pension funds not to tarry in assessing and collecting liability. The fund shall compute liability and demand payment "[a]s soon as practicable after an employer's complete or partial withdrawal". 29 U.S.C. Sec. 1399(b)(1).
 
 
 15
 The trustees' obligation to act with dispatch distinguishes debts under ERISA from ordinary contractual debts, in which the debtor and creditor may agree on their own schedule--and in which, therefore, courts often say that there is no duty to accelerate and that each unpaid installment is a new claim. E.g., Frenzel v. Frenzel, 260 Iowa 1076, 152 N.W.2d 157 (1967); Light v. Light, 12 Ill.2d 502, 147 N.E.2d 34 (1957). See Arthur Linton Corbin, 4 Contracts Sec. 951 (1951). The schedule under Sec. 1399(c), by contrast, is not contractual; the employer did not assent to a longer period for payment and suit. We have not seen any case extending the contractual approach to the MPPAA, and like the district court we believe that it would be imprudent to adopt a rule that relieves the pressure on trustees of pension funds to act with dispatch. Six years is quite sufficient; the trustees may not award themselves more.
 
 
 16
 Thus the six years began in 1984 and expired before either pension plan filed suit. The potential difference between Sec. 1451(f)(1) and (2) need not detain us, because each pension plan "discovered" the nonpayment immediately. Even the proviso to Sec. 1451(f)(2), awarding six years from discovery in the event of fraud or concealment, would not add a day to the six years available under Sec. 1451(f)(1). (Correspondingly, we need not consider whether the control group's failure to stand up and identify itself is "concealment" for purposes of Sec. 1451(f)(2).) Only the application of a tolling rule could enable either pension plan to recover.
 
 
 17
 Judge Plunkett concluded that tolling is unavailable because the time limit is "jurisdictional." He understood Smith v. Chicago Heights, 951 F.2d 834, 838 (7th Cir.1992), to establish the principle that statutes of limitations applicable to claims "unknown to the common law" are jurisdictional and hence not subject to tolling or estoppel. The portion of Smith that contains this discussion dealt with Illinois law. There is no comparable rule when a federal statute supplies the period of limitations. To the contrary, periods of limitations in federal statutes--almost all of which establish rights "unknown to the common law"--are universally regarded as non-jurisdictional. E.g., Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 392-98, 102 S.Ct. 1127, 1131-35, 71 L.Ed.2d 234 (1982) (period for filing charges under Title VII of the Civil Rights Act of 1964 is subject to waiver and tolling). Only rules limiting the commencement of actions against the United States itself have been given the "jurisdictional" treatment, on account of sovereign immunity rather than some principle distinguishing statutory from common law rights. Even the doctrine protecting the national government from tolling a period of limitations crumbled recently. Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95-96, 111 S.Ct. 453, 457-58, 112 L.Ed.2d 435 (1990). We hold accordingly that Sec. 1451(f) does not curtail the jurisdiction of the federal courts.
 
 
 18
 It does not necessarily follow that doctrines of tolling and estoppel are fully applicable. Principles of tolling and estoppel apply to most federal statutes of limitations but not all, as Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, --- U.S. ----, ----, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991), shows. Sometimes Congress sets an outer bound on the time to commence an action, a statute of repose to compliment the period of limitations. Lampf holds that Sec. 9(e) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78i(e), establishes an unyielding three-year limit on the commencement of suits. Section 9(e) reads: "No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." The Court was impressed by the dual periods: one running from discovery, and a longer period, serving as an outer limit, from the violation. The Court concluded that "the equitable tolling doctrine is fundamentally inconsistent with the 1-and-3-year structure." --- U.S. at ----, 111 S.Ct. at 2782. See also Short v. Belleville Shoe Manufacturing Co., 908 F.2d 1385, 1391-92 (7th Cir.1990) (Sec. 13 of Securities Act of 1933, 15 U.S.C. Sec. 77m, is not subject to tolling or estoppel). Section 1451(f) likewise establishes a split period: three years from discovery (Sec. 1451(f)(2)) and six years from the actual injury (Sec. 1451(f)(1)). There is even a proviso to Sec. 1451(f)(2) adding three years for fraud or concealment. Provision in the statute for a defined extra time for fraud or concealment makes it problematic for judges to use acts of the sort to which these pension funds point--silence in response to inquiries, a mild form of "concealment"--as a reason to grant time beyond six years. Unlike Sec. 9(e) of the Exchange Act, however, Sec. 1451(f) of ERISA does not specify a maximum time measured from the violation, so perhaps there is room for some tolling doctrines. But we must be careful not to use tolling principles to contradict the legislative decision that fraud and concealment justify six years from discovery, not more.
 
 
 19
 Today's case is not an occasion to determine the limits to equitable extensions under ERISA. Federal law contains two kinds of time-extending principles: equitable estoppel and equitable tolling. Equitable estoppel "denotes efforts by the defendant--above and beyond the wrongdoing upon which the plaintiff's claim is founded--to prevent the plaintiff from suing in time." Cada, 920 F.2d at 451. Cada gave as an example a promise not to plead the statute of limitations. Navco and Caldwell did not attempt to deceive the pension funds or induce them to defer suing. Equitable tolling, the other doctrine, "permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." Ibid. This doctrine is potentially important in control group cases, because sometimes even six years will not be long enough to round up every last member. But equitable tolling hardly helps the pension funds, which were not "diligent" even by the standards of the Soviet Union. (Where labor's motto was: "We pretend to work, and they pretend to pay us.")
 
 
 20
 The Teamsters Fund sent letters in November 1983 and March 1984, after which it fell silent. The Independent Fund did not inquire until August 1990--when by our reckoning the six years had expired. Then it asked for schedules filed in the bankruptcy case, plus any other information the attorney cared to provide. Relying on a lawyer whose client had ceased to exist (U.S. Bedding's bankruptcy had been converted to a Chapter 7 liquidation and a trustee appointed) is problematic. The Independent Fund itself may have had the files in the bankruptcy case, or readily could have obtained them from the court; it was one of the firms' largest creditors. From these files the Independent Fund could have learned about Caldwell and asked him some questions. Either fund could have consulted Dun & Bradstreet or an equivalent service to find out what was publicly known about the firms' sources of capital. Either fund could have learned about Van Vorst's corporate structure by consulting the filings in that firm's bankruptcy, ongoing since November 1983. Reasonably diligent entities claiming that they are owed two thirds of a million dollars do that and more.
 
 
 21
 AFFIRMED.