**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, a pension trust, et al., Plaintiffs,**

v.

**MISSISSIPPI WAREHOUSE CORP., a former Mississippi Corp. et al., Defendants.**

**No. 91 C 1332.**

United States District Court, N.D. Illinois, Eastern Division.

May 5, 1994.

Terence George Craig, Central States Law Dept., Rosemont, IL, David A. Sawyer, Russell N. Luplow, David Machnacki, Russell N. Luplow, P.C., Bloomfield Hills, MI, for plaintiffs.

Harry John Secaras, Ross & Hardies, P.C., Robert Patrick Casey, Richard Lee Samson, Murphy, Smith & Polk, Chicago, IL, James E. Price, Price, Krohn & McLemore, Corinth, MS, for defendants.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

This suit was brought by Central States, Southeast and Southwest Areas Pension Fund ("Central States") on March 4, 1991 to collect withdrawal liability, interest and liquidated damages incurred when Dean Truck Lines, Inc. ("Dean Truck") withdrew from Central States in 1981. The Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381–1453, imposes mandatory liability on all withdrawing employers. A pension fund must collect a portion of the plan's deficit from the withdrawing employer. 29 U.S.C. § 1381.

In 1985, a judgment was entered in favor of Central States for $687,000 plus $137,400 interest for withdrawal liability. *American Trucking Association, et al. v. Pension Benefit Guaranty Fund and Central States Southeast and Southeast Areas Pension Fund,* No. J82–0061(R) (S.D.Miss. June 27,

1985). Dean Truck did not satisfy the judgment.

Central States now seeks to collect that judgment from Mississippi Warehouse Corporation ("Warehouse"). Central States alleges that Warehouse was a trade or business under common control with Dean Truck and is therefore jointly and severally liable for Dean Truck's withdrawal obligation pursuant to § 1301(b)(1) of ERISA.

Warehouse has moved for summary judgment claiming that this action is barred by 29 U.S.C. § 1451(f), ERISA's limitations provision, and that there can be no genuine dispute that Warehouse was not under common control with Dean Truck at the time of withdrawal.

Central States has moved to strike Warehouse's limitations defense and Warehouse's jury demand. It has also filed a motion for summary judgment.

This Court referred the cross-motions for summary judgment and the motion to strike to Magistrate Judge Weisberg. In his Report and Recommendation, the Magistrate Judge advised that Warehouse's motion for summary judgment be granted because the federal law claims were time-barred under ERISA's statute of limitations, 29 U.S.C. § 1451(f).

Before this Court are Central State's objections to the Magistrate Judge's Report and Recommendation. Additionally, Central States asks this court to: (1) grant its motion for summary judgment; (2) grant its motion to strike Warehouse's affirmative defenses; and (3) grant its motion to strike Warehouse's jury demand.

## ANALYSIS

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when there is a showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). To determine whether there are any genuine issues of fact, the court will examine the entire record in the light most favorable to the non-moving party. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513–14. Under this standard, the Court grants the defendant's motion for summary judgment and denies plaintiff's motion for summary judgment.

### ERISA LIMITATIONS

■ Central States urges this Court to find that 29 U.S.C. § 1451(f) only governs the initial action brought by a pension fund to collect withdrawal liability and that subsequent actions brought against entities under common control are governed by the state statute of limitations applicable to an action to collect a judgment.[1] Warehouse, alternatively, asserts that an action brought pursuant to Subchapter III of ERISA must necessarily follow the statute of limitations set forth in § 1451 and not the state statute of limitations for an action to collect a judgment.

29 U.S.C. § 1301(b)(1) states that "for purposes of this subchapter" all trades or businesses under common control are to be treated as a single employer, and thus subject to joint and several liability. *Central States, Southeast and Southwest Areas Pension Fund v. Ditello*, 974 F.2d 887, 890 (7th Cir. 1992); *Central States, Southeast and Southwest Areas Pension Fund v. Koder*, 969 F.2d 451, 453 (7th Cir.1992). Within the same subchapter, Subchapter III [29 U.S.C. §§ 1301–1461], Congress included § 1451(f) which establishes the statute of limitations for bringing an action for withdrawal liability. Congress did not specify a different limitations period or any alternative route for collecting withdrawal liability from an entity under common control. Rather, Congress intended to make an action brought under ERISA subject to § 1451(f) limitations and expressly stated that all other state laws relating to employee benefit plans are preempted by ERISA. *See Central States, Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co., Inc.*, 788 F.2d 428, 433 (7th Cir.1986) (stating that "statutory language is the most reliable indicator of congressional intent"). Thus, the statute's language makes it clear that the only applicable limitations period for bringing an action to collect withdrawal liability is that defined by § 1451(f).

Section 1451 sets forth the following limitations:

> An action under this section may not be brought after the later of—
>
> (1) 6 years after the date on which the cause of action arose, or
>
> (2) 3 years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action; except that in the case of fraud or concealment, such action may be brought not later than 6 years after the date of discovery of the existence of such cause of action.

29 U.S.C. § 1451(f)(1)–(2).

■ A cause of action for unpaid withdrawal liability accrues on the date when payment is demanded but not paid, not when withdrawal occurs. *See Joyce v. Clyde Sandoz Masonry*, 871 F.2d 1119, 1122–24 (D.C.Cir.1989); *Central States, Southeast and Southwest Areas Pension Fund v. Navco*, 3 F.3d 167, 171 (7th Cir.1993). Such an accrual rule is consistent with other Seventh Circuit cases that have identified the accrual of a cause of action as the time when a plaintiff learns of his injury. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir.1990). In a withdrawal case, a pension fund learns of its injury when the employer fails to make a demanded payment before the 60–day grace period, provided by § 1399(c)(2), expires. *Clyde Sandoz Masonry*, 871 F.2d at 1122–1124; *Navco*, 3 F.3d at 171.

■ In a withdrawal liability case, the commencement of the limitations period does not depend upon the pension fund's knowledge of the identity of all members of a controlled group who may be jointly and

---

1. In this case Mississippi law which permits a party to bring an action to collect on a judgment within seven years of the entry of judgment. Miss.Code Ann. § 15–1–43.

severally liable. *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Van Vorst Industries, Inc.,* 800 F.Supp. 587, 593 (N.D.Ill. 1992). As the Seventh Circuit reasoned in *Navco,* "If a cause of action accrues even though the victim does not know that he has a legal entitlement to recover, the fact that the victim does not know who would be the right defendant cannot matter." 3 F.3d at 171. The six year limitation is "generous" and "would not be so long if the fund had to know the existence of the debt, nonpayment, and identity (and relation to the employer) of controlled group members for the 6 years to even start." *Id.* The six year limitation is designed to give the fund sufficient time to search for vital information, such as the existence and identity of controlled group members.

To hold that a cause of action does not accrue until a fund learns of the identity of controlled group members would run counter to the purposes of such limitations which is to prevent stale claims which are difficult to prove and allow potential defendants to assess their liabilities. Additionally, with regard to ERISA, the six year limitation period protects beneficiaries by pressuring the trustees to act with dispatch to enforce the rights of those beneficiaries. *Id.* at 172.

■ Central States, however, asserts that it is not bringing an action under § 1301, but merely enforcing the judgment that it already obtained. 29 U.S.C. § 1301(b)(1) states that trades or businesses under common control are to be treated as a single employer. *Central States, Southeast and Southwest Areas Pension Fund v. Slotky,* 956 F.2d 1369, 1375 (7th Cir.1992); *Central States, Southeast and Southwest Areas Pension Fund v. Hayes,* 789 F.Supp. 1430, 1435 (N.D.Ill.1992). Central States reasons that as a result of § 1301(b)(1), a judgment against one controlled group member is a judgment against all. Central States claims that only the initial suit, in contrast to each attempt to enforce the judgment, needs to be brought within the limitations period

set forth by § 1451(f). *Slotky,* 956 F.2d at 1375. Thus, Central States argues that a judgment against Dean Truck is a judgment against Warehouse.

In support of its position Central States relies upon the alter ego doctrine. Central States concludes that the liability of an alter ego and a controlled group member must be identical because both are deemed, by statute, to constitute "one" entity. As controlled group members are analogous to common law alter egos, Central States argues that the cases involving liability of common law alter egos are supportive.

Although some courts have chosen to adopt such an approach, *Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc.—Pension Fund v. Gotham Fuel,* No. 92–4094 (D.N.J.1993); *Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc.—Pension Fund v. Able Truck Rental Corp.,* 822 F.Supp. 1096, 1098 (D.N.J.1993),[2] the Seventh Circuit and other courts in the Northern District of Illinois have not. *Central States, Southeast and Southwest Areas Pension Fund v. Navco,* 3 F.3d 167 (7th Cir.1993); *see also Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Van Vorst,* 800 F.Supp. 587 (N.D.Ill. 1992).

■ While in some instances the criteria for determining whether two entities are alter egos has been equated with the basic indicia for determining whether two companies are members of the same controlled group, this Court agrees with the Magistrate Judge that the two are not identical. A finding that a shareholder is an alter ego is a determination that the corporation is not an independent entity but instead has attempted to defraud creditors through a technical change in the structure or identity of the company without any substantial change in ownership or management. *Esmark, Inc. v. National Labor Relations Board,* 887 F.2d 739, 750 (7th Cir.1989). In contrast, a finding that an entity is a member of an ERISA controlled group does not depend on any

---

**2.** Moreover, these cases are distinguishable from the present case in that the defendants in these cases conceded their control group status where-

as Warehouse claims that it was not a member of the Dean Control Group when Dean Truck withdrew from the pension fund.

attempted fraud by the controlling party. Rather, companies that operate entirely independently of each other may be treated as a "single employer." 29 U.S.C. § 1301(b)(1). 29 U.S.C. § 1301 does not depend upon a finding that entities are alter egos, in that they have common management. Instead, a finding of common control under ERISA depends upon section 414(c) of the Internal Revenue Code, 26 U.S.C. § 414(c). 29 C.F.R. § 2612.2. In this case, whether Warehouse was a member of the same controlled group as Dean Truck depends on IRS stock attribution rules.

■ Moreover, the liability of an alter ego and a member of a controlled group differ. An alter ego's liability is the same as the liability of the alleged corporation. On the other hand, a controlled group member is jointly and severally liable only if it is a party to the action and the plaintiff obtains a judgment against it. *See Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320 (7th Cir.1992); *Cf. Lumpkin v. Envirodyne Industries, Inc.*, 933 F.2d 449 (7th Cir. 1991).

■ Thus, an ERISA action brought under § 1301 against an alleged controlled group member is distinguishable from an action brought against an alter ego. An action against an alleged controlled group member is not merely an action brought to enforce the earlier judgment; it is, instead, a separate ERISA action brought against a previously unjoined, alleged member of the controlled group. *Hayes*, 789 F.Supp. at 1434. Under § 1301(b)(1), a fund does not need to sue all of the controlled group members at the risk of losing its right against unjoined parties; if it chooses, it may even institute successive actions against each controlled group member in an attempt to collect damages. *Id.* Thus, when a fund brings a separate action against a potential controlled group member it is not merely bringing a supplementary action to enforce the earlier judgment; it is bringing a new suit on the theory that the alleged controlled group member is jointly liable for the withdrawal assessment. *Id.* Therefore, each action brought against an alleged controlled group member on the basis of joint and several liability must be brought within the ERISA limitations period set forth in 29 U.S.C.A. § 1451(f). Since Central States is proceeding under ERISA, and not merely seeking to enforce its judgment against Dean Truck, it is bound by the limitations period stated in § 1451(f). It may not invoke ERISA withdrawal provisions while simultaneously appealing to a state statute of limitations for the collection of a judgment.

■ Since Dean Truck did not default on its payment until May 1, 1982, the cause of action did not accrue until that time. Central States had until May 1, 1988 to bring a cause of action against Dean Truck or any other alleged controlled group member, including Warehouse. Central States did not bring a cause of action against Warehouse within the allotted time and its present action is therefore barred under § 1451(f)(1).

■ Central States asserts that even if this Court elects to apply the § 1451 statute of limitations, as opposed to the state statute of limitation for the collection of judgments, Central States may bring its action against Warehouse under § 1451(f)(2). The three-year-after knowledge provision of § 1451(f)(2) allows a plaintiff to bring an action "3 years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action." 29 U.S.C. § 1451(f)(2). Central States claims that it did not know that Warehouse was in a controlled group with Dean Truck and, therefore, it did not know nor should it have known that it had a cause of action against Warehouse. However, after reviewing the record, the Court agrees with the Magistrate Judge that Central States should have known that it had a cause of action against Warehouse by early 1983.

The parties do not dispute that on June 26, 1981 Dean Truck withdrew from the fund and incurred withdrawal liability. On March 1, 1982 Central States sent John Dean, Jr. and other entities under common control (the "Dean Control Group") a demand for payment, followed on May 1, 1982 by a notice of default. No separate notice or demand was ever sent to Warehouse. Neither John Dean

nor any other entity under common control has made any payments.

The parties concede that prior to March 26, 1981 Warehouse was under common control as defined by the IRS attribution rules, 26 C.F.R. § 1.414(c)–4(b), because John Dean owned 100% of the stock of Warehouse and more than 50% of the stock of Dean Truck. (Warehouse's Rule 12(m) Statement of undisputed facts ¶ 11; Central States Rule 12(n) Statement ¶¶ F, H.) On March 26, 1981 John Dean gave 1,954 shares each of Dean Truck to his wife, his son, his daughter, and his daughter-in-law. (Warehouse's Rule 12(m) Statement of undisputed facts ¶ 12.) Thus, as of March 26, 1981 Dean Truck was no longer under common control with Warehouse.[3] On October 15, 1981, Warehouse voluntarily dissolved, and its assets were distributed to its sole shareholder, John Dean. (Plaintiff's Brief Exhibit 19; Plaintiff's Reply Brief Exhibit 1.)

After Dean Truck withdrew from the fund, Central States asked Dean Truck to complete a form captioned "Statement of Business Affairs." Dean Truck's response, dated August 20, 1981, stated that it was a member of a controlled group, but that the only other entity in that group was Debin Leasing Co., Inc., a wholly-owned subsidiary of Dean Truck. No mention was made of Warehouse.

On September 1, 1982, Dean Truck filed a response to an interrogatory served on it by the Pension Benefit Guaranty Corporation ("PBGC"), in a suit joined by Dean Truck against PBGC and Central States. The interrogatory asked Dean Truck if it had previously been a member of a group of trades or businesses under common control under 29 U.S.C. § 1301(b) and, if so, with which entities. Dean Truck declined to answer, taking the position that this was a conclusion of law. However, Dean Truck did refer to and supply documents that indicated that Warehouse had been a member of the Dean Control Group through December 1980. The documents included Dean Truck's federal income tax returns for 1950 through 1980 and annual reports filed with the ICC from 1958 to 1980.

Central States claims that it did not know that Warehouse had been a previous controlled group member because the tax returns supplied by Dean Truck were inaccessible as a result of a confidentiality agreement. This Court agrees with the Magistrate Judge that it would be unusual if one co-defendant (PBGC) could view the documents that the other co-defendant (Central States) could not. However, even if that were the case, copies of Dean Truck's tax returns and annual reports were also made available to Central States during the deposition of Dean Truck's former vice-president, William Odom on November 18, 1982. In fact, Dean Truck's tax returns and annual reports were made exhibits to Odom's deposition. (Warehouse's Motion for Summary Judgment, Appendix containing Odom's deposition at 24–71.) Thus, this Court agrees with the Magistrate Judge's conclusion that the confidentiality agreement, which prevented Central States from exposing Dean Truck's tax returns to the public, did not prevent Central States itself from viewing these documents and thereby learning that Warehouse was a potential controlled group member.

 Central States should have investigated Warehouse's possible several and joint liability, especially since it knew that Dean Truck had no assets. The duty to investigate would not have placed an unreasonable burden upon Central States. Dean Truck identified Warehouse as a previous controlled group member in the documents supplied to PBGC in the suit joined by Dean Truck against PBGC and Central States. Central States simply had to review the documents in order to determine that Warehouse was potentially liable for Dean Truck's withdrawal liability. *See Navco*, 3 F.3d at 174 (concluding that the burden placed upon a fund to learn the corporate structure was minimal since it could have consulted bankruptcy files.)

Although Central States' actual knowledge is unclear, it is clear that Central States should have known by late 1982 or early 1983 that Warehouse was potentially liable for

---

**3.** Central States disputes that these gifts took place, an issue addressed later.

Dean Truck's withdrawal liability.[4] Therefore, Central States is barred by the three-years-after knowledge provision of § 1451(f)(2).

■ The second provision of § 1451(f)(2) allows a plaintiff to bring a cause of action up to six years after discovering the identity of an unknown controlled group member if the plaintiff was unable to reasonably discover the identity of other potential controlled group members due to fraud or concealment.

Central States claims that this provision is applicable to the present case because the March 26, 1981 stock transaction never occurred or alternatively, because the principal purpose of the March 26, 1981 stock transaction was the evasion of withdrawal liability.

To succeed on either claim, Central States must show that a reasonable trier of fact could find that Central States was unable to reasonably discover Warehouse's identity due to Dean Truck's fraud or concealment and is thus entitled to bring an action up to six years after learning that Warehouse was potentially liable for Dean Truck's withdrawal liability. This Court agrees with the Magistrate Judge that Central States has not met its burden of showing that it was unable to identify Warehouse as a controlled group member due to Dean Truck's fraud.

Central States first claims that the March 26, 1981 stock transaction never occurred and that Dean Truck has misrepresented this fact. If the stock transactions of March 26, 1981 never occurred, Central States alleges that according to the IRS attribution rules, Warehouse was under common control with Dean Truck on the date that Dean Truck withdrew from the pension fund. Consequently, Central States asserts that Dean Truck falsely stated that Warehouse was not under common control with Dean Truck in its Statement of Business Affairs dated August 20, 1981 and misrepresented the entities within the controlled group on the § 1399 inquires which were specifically designed to identify the controlled group's membership.

Warehouse states that the stock transfers did take place and that the Statement of Business Affairs correctly identified the current controlled group. Both Dean Truck's attorney and accountant concluded that, assuming the transfers were made, Warehouse was not in the controlled group under the IRS attribution rules. Furthermore, Warehouse asserts that there was no misrepresentation since the § 1399 inquiries did not request information concerning entities that *had been* members of the controlled group in the recent past, or any transactions affecting the status of a member of the controlled group.

The only evidence that Central States provides in support of its claim that the stock transactions never occurred is a letter dated May 8, 1981, prepared by Dean Truck's accountant, which lists the holdings of the shareholders of Dean Truck but does not reflect the March 26, 1981 transfers. However, the accountant testified that he got the shareholder figures from Dean Truck's former vice-president who testified that he did not learn of the March 26, 1981 transfers until June, 1981.

John Dean had made gifts of stock to his children in the past. He testified that the gifts were a spur of the moment decision to share assets with his family. Dean and his mother transferred their stock on the same date, allowing the children to receive the maximum amount of stock without incurring an obligation for gift tax. On July 28, 1981, Odom sent a current list of shareholders and their holdings to attorney Donald Walker who advised him that Warehouse was not a member of the controlled group. Odom testified that he and Dean only learned after the transfers that as a result of the attribution rules Warehouse was no longer a part of the controlled group. After reviewing the materials submitted by the parties, this Court agrees with the Magistrate Judge that Central States has failed to come forward with sufficient evidence that would permit a rea-

---

4. Contrary to Central States' assertion, Magistrate Judge Weisberg did not conclude in his Report and Recommendation that Central States actually knew that Warehouse was a potential control group member, but merely that they should have known. (Magistrate Report and Recommendation at 12).

sonable trier of fact to find that the stock transfers were not made.

 In the alternative, Central States argues that it has six years from its discovery of Warehouse's relationship to Dean Truck in which to bring suit because the principal purpose of the March 26, 1981 transactions was the evasion of liability. Since Dean and his mother had made similar stock transfers in the past, there is little evidence to indicate that the transactions were motivated by the desire to evade liability. Moreover, in his deposition, Dean testified that he did not decide to close Dean Truck and withdraw from Central States until June 22, 1981.

However, even if the stock transfers were made in order to avoid withdrawal liability, this Court agrees with the Magistrate Judge that such a transfer is not fraudulent unless it is accompanied by material misrepresentations or omissions of fact. Absent a material misrepresentation or omission, a transaction having as its principal purpose the evasion of liability does not by itself prevent a fund from discovering the identity of potential controlled group members.[5] Central States has not demonstrated that the stock transfer in and of itself prevented Central States from discovering that Warehouse had previously been in the controlled group and was therefore potentially liable.

This Court holds that a reasonable juror could not find that Central States was prevented from discovering Warehouse's relationship to Dean Truck because of Dean Truck's alleged fraud or concealment.

## CONCLUSION

For the foregoing reasons this Court affirms and adopts the Magistrate Judge's Report and Recommendation, grants Defendant's motion for summary judgment and orders that the ERISA claim be dismissed as time-barred. Central States motion to strike Warehouse's affirmative defenses and motion

to strike Warehouse's jury demand are dismissed as moot.

---

5. Although a transaction having as its principal purpose the evasion of liability might affect the withdrawal liability assessment under § 1392(c), this would not alter the § 1451 limitation provision unless the fund was prevented from learning of the defendant's identity through fraud or concealment.