

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-30-1994

# Machinists Pension Fund, Dist. 15 v. Khale Engineering Corp.

Precedential or Non-Precedential:

Docket 94-5160

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Machinists Pension Fund, Dist. 15 v. Khale Engineering Corp." (1994). *1994 Decisions.* Paper 232.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/232

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 94-5160


BOARD OF TRUSTEES OF THE DISTRICT NO. 15
MACHINISTS' PENSION FUND,
                    Appellant

v.

KAHLE ENGINEERING CORPORATION, a New Jersey corporation


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 93-cv-04285)


Argued:  September 13, 1994


Before:  SLOVITER, Chief Judge, MANSMANN
        and ALARCON[*] Circuit Judges


(Filed December 30, 1994)


Elizabeth Roberto (Argued)
Eames, Wilcox, Mastej, Bryant,
 Swift & Riddell
Detroit, MI  48226

        Attorney for Appellant

_____

[*] Hon. Arthur L. Alarcon, United States Circuit Judge for the
Ninth Circuit, sitting by designation.

Joseph J. Malcolm (Argued)
Grotta, Glassman & Hoffman
Roseland, NJ  07508

On the Brief:
 James M. Beach

        Attorneys for Appellee

David S. Allen
Jacobs, Burns, Sugarman,
  Orlove & Stanton
Chicago, IL  60606

        Attorney for Amicus-Appellant
        Chicago Truck Drivers, Helpers
        and Warehouse Workers Union
        (Independent) Pension Fund

Diana L.S. Peters
Feder & Associates
Washington, DC  20036

        Attorney for Amicus-Appellant
        National Coordinating
        Committee for Multiemployer Plans

OPINION OF THE COURT

SLOVITER, Chief Judge.

The Board of Trustees of the District No. 15 Machinists' Pension Fund (Fund or Pension Fund) appeals the dismissal of their action to collect an assessment of withdrawal liability filed against Kahle Engineering Corp. under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub. L. No. 96-364, 94 Stat. 1208 (1980) (codified as amended at 29 U.S.C. §§ 1001a, 1381-1453 (1988 & Supp. V 1993)), which amended the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. No. 93-406, 88 Stat. 832 (codified as amended at 29 U.S.C. §§

1001–1461 (1988 & Supp. V 1993)).  The district court entered summary judgment against the Fund on the basis of the statute of limitations.

This appeal requires us to determine whether the district court correctly held that the six-year statute of limitations in the MPPAA began to run for the entire liability when the employer first missed an installment payment, even though the payout period was more than nine years.  Apparently, no federal appellate court has addressed this precise issue of statutory interpretation under the MPPAA although two other courts of appeals have decided cases which suggest possible, and conflicting, interpretations.

I.

<u>The Statutory Scheme</u>

The MPPAA was enacted by Congress in 1980 as an amendment to ERISA to insure the financial stability of multiemployer pension plans by imposing mandatory liability on employers withdrawing from a pension plan. <u>See</u> <u>Laborers Health and Welfare Trust Fund v. Advanced Lightweight Concrete Co.</u>, 484 U.S. 539, 545 (1987). In <u>IUE AFL-CIO Pension Fund v. Barker & Williamson</u>, 788 F.2d 118 (3d Cir. 1986), we identified two goals for the MPPAA: "'to protect the interests of participants and beneficiaries in financially distressed multiemployer plans, and . . . to ensure benefit security to plan participants.'" <u>Id.</u> at 127 (quoting H.R. Rep. No. 869, 96th Cong., 2d Sess. 71, <u>reprinted in</u> 1980 U.S.C.C.A.N. 2918, 2939). The principal manner in which these goals are effectuated by the act is by the imposition of withdrawal liability on an employer who withdraws from a multiemployer pension plan in the proportionate share of the plan's unfunded vested benefits. <u>Crown Cork & Seal v. Central States Pension Fund</u>, 982 F.2d 857, 861 (3d Cir. 1992), <u>cert. denied</u>, 113 S. Ct. 2961 (1993); <u>see</u> <u>also</u> <u>Concrete Pipe and Prods. v. Construction Laborers Pension Trust for S. Cal.</u>, 113 S. Ct. 2264, 2272 (1993).

The statute sets forth an intricate scheme for the calculation and collection of the withdrawal liability and resolution of disputes with respect thereto.[1] When an employer

---

[1]. The statutory scheme is supplemented by regulations promulgated by the Pension Benefit Guaranty Corporation (PBGC). As enacted in 1974, ERISA created the PBGC within the Department of Labor "to administer and enforce a pension plan termination

withdraws from a multiemployer plan, the plan sponsor must determine the amount of withdrawal liability, and "as soon as practicable" notify the employer of the amount of liability and the schedule for repayments and demand payment in accordance with that schedule.  See 29 U.S.C. §§ 1382, 1399(b)(1).  The plan sponsor must set up a schedule for withdrawal payments which may impose liability to a maximum of twenty years.  Id. §§ 1399(b)(1)(A)(ii), 1399(c)(1).  The first installment payment on the schedule is due within sixty days of the plan sponsor's demand.  Id. § 1399(c)(2).  Under an exception for labor-disputes, the employer shall not be considered to have withdrawn from a plan solely because an employer suspends contributions during a labor dispute involving its employees.  Id. § 1398.

No later than ninety days after the employer receives notice from the plan sponsor of the determination of withdrawal liability, the employer may ask the plan sponsor to review any specific matter and to reassess the schedule of payments; "may identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer;" and may furnish any additional relevant information to the plan sponsor. Id. § 1399(b)(2)(A).  The plan sponsor must conduct a reasonable review of any matter raised by the employer, and notify the

(..continued)
insurance program" and granted it the statutory authority to promulgate regulations in carrying out the purposes of ERISA. See Concrete Pipe, 113 S. Ct. at 2271 (citing 29 U.S.C. § 1302(a)-(b)).

employer of its decision, the basis for its decision, and any changes made as a result of the review. Id. § 1399(b)(2)(B).

An employer who wishes to contest the fact of its liability or the amount must initiate arbitration. If it does not, it waives the right to contest the assessment and the amounts demanded by the plan sponsor become "due and owing" as set forth on the payment schedule, and the employer may be sued for collection in state or federal court. Id. § 1401(b)(1).

Under the acceleration provision of the statute available in the event of a default, the "plan sponsor may require immediate payment of the outstanding amount of the employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made." Id. § 1399(c)(5); see also 29 C.F.R. § 2644.2(b)(2). For purposes of this section, default is defined as "the failure of an employer to make, when due, any payment if not cured within sixty days after the employer receives written notification from the plan sponsor of such failure." 29 U.S.C. § 1399(c)(5)(A). A default can also be "any other event defined by the plan rules which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." Id. § 1399(c)(5)(B).

A PBGC regulation prohibits a declaration of default for failure to make timely payments during the period, and for sixty days thereafter, that an arbitration is pending or that the plan sponsor is conducting the employer's requested review. See 29 C.F.R. § 2644.2(c)(1). However, the statute provides that

payments in accordance with the schedule set forth by the plan sponsor must be made "notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule."  29 U.S.C. § 1399(c)(2).  If an employer misses a scheduled payment, the fund may seek to collect by filing a collection action but it may not accelerate the balance during that protected arbitration period.  See United Retail and Wholesale Employees Pension Plan v. Yahn & McDonald, 787 F.2d 128, 131 (3d Cir. 1986), aff'd per curiam by an equally divided court sub nom., PBGC v. Yahn & McDonald, 481 U.S. 735 (1987) (hereinafter Yahn).

An action for liability under the MPPAA may be brought by a plan fiduciary, employer, plan participant, beneficiary or an employee organization which represents such a plan participant or beneficiary "adversely affected by the act or omission of any party" under the statute or by an employee organization.  29 U.S.C. § 1451(a)(1).  That action must be filed within six years after the date on which "the cause of action" arose.  Id. § 1451(f)(1).[2]

_____

[2].  Under another prong of the statute of limitations provision, not at issue here, the action may also be brought within three years after the plaintiff knew or should have known of the existence of such a cause of action except that in the case of fraud or concealment, this "discovery prong" is extended to six years.  The full text of the provision is:

> An action under this section may not be brought after the later of –
>
> (1) 6 years after the date on which the cause of action arose, or

With the statutory scheme in mind, we turn to the facts of this case.  Our task is to determine when the Pension Fund's "cause of action" that is the subject of this suit arose.

II.

Facts and Procedural History

Kahle was a contributing employer to the Pension Fund pursuant to the collective bargaining agreements it entered into with its union.  Following a labor dispute in 1981, Kahle suspended contributions to the Pension Fund.  On April 23, 1984, in accordance with 29 U.S.C. §§ 1382, 1399(b)(1), the Fund notified Kahle in writing that it had determined that Kahle had withdrawn from the Fund and requested payment of withdrawal liability in the amount of $271,746, payable in thirty-eight quarterly installment payments of $9,467 each, beginning on July 1, 1984, with a final thirty-ninth payment of $6,459, payable in January, 1994.[3]  The April 23 letter also notified Kahle of its

(..continued)
(2) 3 years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action; except that in the case of fraud or concealment, such action may be brought not later than 6 years after the date of discovery of the existence of such cause of action.

See 29 U.S.C. § 1451(f).

[3].  We note that the payment figures total $366,205, which the Pension Fund explained in the district court was attributable to interest on the principal amount of $271,746.  Kahle objected to the interest, but it is unclear whether it objected to the fact of interest or its computation.  We will leave that issue to the district court on remand.

statutory right to request review from the Fund, to identify any inaccuracies, and to furnish any additional relevant information.

In response, on July 2, 1984 Kahle wrote that it "has not withdrawn from the Fund," that the cessation of contributions was caused solely by a strike which commenced on June 22, 1981 and continued in 1982, and that the company remains ready and willing to negotiate with the Union. The letter stated it constituted an official request under section 4219(b)(2) of ERISA [29 U.S.C. § 1399(b)(2)] for review of the Fund's determination that the company had withdrawn, that withdrawal occurred on June 22, 1981 and of the figures used to calculate the withdrawal liability. Kahle enclosed a first installment payment of $9,467 with the letter. App. at 26-27.

On August 2, 1984, the Fund's counsel advised Kahle by letter that he would raise the request for review of the withdrawal liability determination at the next meeting of the Fund Trustees and would speak to the union about Kahle's claims of continued negotiation and representation. Counsel also posed questions to Kahle about its claim of continuing negotiation with the union. App. at 59-60.

Kahle's response dated September 13, 1984 made clear there were no negotiations to end the strike and that picketing continued until April 1982, but that "[b]oth parties remained at the call of the Federal Mediator." In the last sentence of that letter, Kahle stated that "pursuant to 29 C.F.R. § 2644.2(c) the

Company will discontinue quarterly payments."[4] App. at 28–29. In fact, the referenced PBGC regulation did not authorize Kahle to withhold the scheduled payments but merely prohibited the Fund from declaring default during the pendency of arbitration. See 29 C.F.R. § 2644.2.

Kahle sent the Fund's counsel a letter on December 20, 1984, demanding arbitration.[5] Before the Fund's counsel had received the December 20, 1984, letter, he wrote to Kahle's counsel on December 21, 1984, stating that the Trustees saw no reason to change their determination that Kahle had withdrawn from the Plan. App. at 30. The December 21 letter also stated, "Please be . . . advised that your client is now in default in its payments. Unless it cures this default by the 1st of January 1985, our client will have no alternative but to declare your client 'in default' and seek all remedies available to it . . . under appropriate federal legislation." App. at 30.

---

[4]. The September 13 letter was never received by Fund counsel although the Fund does not contest its contents, and there are later letters that referred to it. The Fund appears to have suggested in the district court that the September 13 letter constituted a demand for arbitration that tolled the accrual of its cause of action and the consequent statute of limitations, but the district court gave that argument short shrift because it is undisputed that neither party took any steps to invoke the arbitration procedure. In the view we take of the statute of limitations issue, we need not decide whether the allusion to arbitration by the employer would have stopped the accrual of the cause of action for any length of time.

[5]. The contents of this letter, and particularly the demand for arbitration, are referred to in the Fund counsel's subsequent letter of December 28, 1984. App. at 61–62.

On December 28, 1984, the Fund noted receipt of Kahle's letter of December 20, 1984, enclosed another copy of the Fund's actuarial calculations, and stated again that the Fund saw no reason to alter its determination of the fact of or date of withdrawal, but indicated a willingness to review its calculations if Kahle provided more specifics. The Fund acknowledged Kahle's demand for arbitration and suggested that the parties "proceed in accordance with the rules of the American Arbitration Association for all purposes," reserving any objections including timeliness for the arbitrators. The Fund also offered to discuss "these matters on a less formal basis." App. at 61-62.

There is no evidence of further communications, negotiations, or arbitration proceedings after December 1984. Kahle did not make any further payments. Almost four years later, on August 9, 1988, the Fund notified Kahle "that the company is in default in its withdrawal liability payments," demanded all past due payments plus interest, and stated that if Kahle did not make such payments within sixty days the Fund would require "immediate payment of the total withdrawal liability, plus interest accruing from the date the first payment was due." The Fund also demanded that Kahle post a bond for $271,746, the full amount of withdrawal liability. App. at 63-64. The record contains no evidence of further communications until the filing of this suit.

The Pension Fund filed the complaint in the United States District Court for the District of New Jersey on September

28, 1993.  The parties filed cross-motions for summary judgment. Following a hearing on February 28, 1994, the district court granted Kahle's Motion for Summary Judgment and dismissed the case as time-barred under the MPPAA's six-year statute of limitations.  See 29 U.S.C. § 1451(f)(1).

The district court had jurisdiction under 29 U.S.C. §§ 1132(e)(1) and 1451(c) and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291.  A district court's grant of summary judgment is subject to our plenary review.  Mitchell v. Commission on Adult Entertainment Est., 10 F.3d 123, 129 (3d Cir. 1993).  Our review of the statute of limitations under the MPPAA is similarly plenary.  Doherty v. Teamsters Pension Trust Fund, 16 F.3d 1386, 1389 (3d Cir. 1994).

### III.

### Discussion

On the date this lawsuit was filed, September 28, 1993, Kahle was still within the payout period established by the Pension Fund pursuant to the MPPAA for Kahle to complete payment of its withdrawal liability.  That period was not scheduled to expire until January 1994.  Although the six-year statute of limitations precludes the Fund's recovery of any payments due more than six years before the filing of its complaint, and the Pension Fund apparently so concedes, we fail to see any persuasive reason why the Fund should not be entitled to recover the payments due during the six years preceding the filing of its lawsuit.

The district court reasoned that the Fund's cause of action arose when Kahle missed its first payment in October 1984 and, at the latest, December 21, 1984.[6] Under the district court's theory, and that accepted by the dissent in this case, the failure of the Fund to file its suit within six years from that date meant that the Fund's action was untimely, even though it was filed while there were still payments to be made.

We believe that the district court erred when it failed to recognize that the employer's obligation to make the scheduled payments is akin to the obligation to make installment payments. In an installment contract, a new cause of action arises from the date each payment is missed. See 4 A. Corbin, Corbin on Contracts § 951 (1951).

The principles applying the statute of limitations to installment payments are well established:

> In the case of an obligation payable by instalments, the statute of limitations runs against each instalment from the time it becomes due, that is, from the time when an action might be brought to recover it.
>
> ....
>
> The rule that the statute of limitations begins to run against each instalment of an obligation payable by instalments only from the time the instalment becomes due applies although the debtor has the option to pay the entire indebtedness at any time. On the other hand, where there is an acceleration clause giving the creditor the right upon certain contingencies to declare the whole sum due, the statute begins to run, only with respect to each instalment, at the time the instalment becomes due, unless the creditor exercises

---

[6]. It is not clear from the record on what basis the district court concluded that the latest date for accrual of the cause of action was December 21, 1984.

> his option to declare the whole indebtedness due, in which case the statute begins to run from the date of the exercise of his option.

51 Am. Jur. 2d: Limitation of Actions § 133.

As Corbin explains, unless there is a repudiation (analogous to a default and acceleration under the MPPAA), the plaintiff may only sue for each breach as it occurs, and the statute of limitations begins to run from that time. See Corbin supra, § 989; see also United States v. La France, 728 F. Supp. 1116, 1119-20 (D. Del. 1990) (holding that the cause of action for collection of installment payments under a Small Business Administration loan accrues on each installment from the date it falls due in the absence of acceleration).

The analogy of scheduled payments under the MPPAA to installment payments was adopted by the Eleventh Circuit when it held that interest accrues on overdue withdrawal liability from the due date of each missed payment rather than from the due date of the first installment. See Carriers Container Council v. Mobile S.S. Ass'n, 948 F.2d 1219, 1222-24 (11th Cir. 1991). The court reasoned that accruing interest from the date of the first installment would amount to an improper retroactive acceleration of interest. Id. at 1223. But cf. New York Teamsters Conference Pension & Retirement Fund v. McNicholas Transp. Co., 658 F. Supp. 1469, 1476 (N.D.N.Y. 1987) (ordering interest from first date of missed payment under schedule), aff'd, 848 F.2d 20 (2d Cir. 1988). Although the context of Carriers Container was different than the case before us, that court's treatment of each

installment as a separate amount due is in line with the theory proffered by the Pension Fund.

The Fund also refers us to Ludington News Co. and Michigan UFCW/Drug Employers Pension Fund Workers Union and Drug and Mercantile Employers Joint Pension Fund, 9 Employee Benefits Cas. (BNA) 1913 (1988), an arbitrator's decision viewing the withdrawal liability as an installment contract obligation under which "the statute does not begin to run with respect to a particular installment until that installment falls due." Id. at 1916. Although we recognize that Ludington is without precedential effect, it was cited as relevant by another circuit. See Joyce v. Clyde Sandoz Masonry, 871 F.2d 1119, 1124 (D.C. Cir.), cert. denied, 493 U.S. 918 (1989). We also note that Ludington relied on Jackson v. American Can Co., 485 F. Supp. 370 (W.D. Mich. 1980), a case that does provide a meaningful analogy. In Jackson, the court declined to apply the statute of limitations as a basis to summarily dismiss an action by a retiree who had been told in 1963 of the decision to give him reduced pension benefits when they became due in 1973. Id. at 374-75. The court noted that the pension plan may qualify as an installment contract, under which claims do not accrue until each payment comes due. Id. at 374.

The strongest authority in support of the holding of the district court and the arguments of Kahle is the decision of the Seventh Circuit in Central States, Southeast and Southwest Areas Pension Fund v. Navco, 3 F.3d 167 (7th Cir. 1993), cert. denied, 114 S. Ct. 1062 (1994), which, although it arose in

another context, rejected the position of the pension funds in that case that a new cause of action arose when the employer failed to make each scheduled payment when due.

In Navco, the pension funds sought to recover the unpaid withdrawal liability from Navco, a partnership which was part of a corporate group with two firms which withdrew from a pension plan.  The pension funds relied on the MPPAA provision that all members of a group under "common control" are liable for each other's withdrawal liability.  Id. at 169 (citing 29 U.S.C. § 1301(b)(1)).  Suit against Navco was filed more than six years after the first payment by its affiliated corporations was due. Id. at 170.  The district court dismissed the suit as untimely, rejecting the claim of the pension funds that they had six years from their discovery of the existence of Navco to file suit.  The court of appeals affirmed, agreeing that the statute of limitations ran from the accrual of the cause of action rather than from the discovery of the identity of additional responsible persons, id. at 172, an issue not before us.

Because suit was filed more than six years after the first scheduled payment was due (but within six years of the last scheduled payment), the court also had to consider when the cause of action accrued.  It agreed with the district court that the whole claim comes due when the first payment is missed, phrasing its analysis as follows:

> The pension fund has only one claim against the employer (and, derivatively, against the controlling persons): the amount of withdrawal liability.  Although a fund may permit an employer to amortize this sum over 20 years, 29 U.S.C. § 1399(c)(1)(B), the whole amount

> is presumptively due at the outset. Section 1391 calls
> on the pension plan to determine an amount that is
> owed; the financing options under § 1399(c) do not
> break this single debt into little pieces with their
> own statutes of limitations.

Id. at 172.

Even before turning to the policy behind the MPPAA, we find the Navco decision unpersuasive. Consider, for example, a mortgage with a twenty-year payout in a jurisdiction with a six-year statute of limitations. If, for some reason, the mortgage company fails to sue the mortgagor for more than six years after the mortgagor fails to pay the first and succeeding payments, would it be seriously argued that the mortgage company is precluded thereafter from suing for those payments due within the six years preceding the lawsuit or from exercising the acceleration clause as to the remaining fourteen years?

Moreover, we believe that the reasoning of the Seventh Circuit is not supported by the statutory language nor the purposes behind the statutory scheme of the MPPAA. The position of Kahle and Navco that the whole sum becomes due and the whole claim accrues when the first payment is missed in effect imposes a compulsory acceleration clause. This reads out of the statute the relevant statutory provision with respect to acceleration codified in 29 U.S.C. § 1399(c)(5), which makes acceleration discretionary. That provision states:

> (5) In the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made.

29 U.S.C. § 1399(c)(5) (emphasis added).

One must assume that when Congress provided that in the event of a default "a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability," Congress also intended that the plan sponsor could decide not to accelerate the outstanding balance. That option is nugatory if Kahle is correct, because the claim would accrue automatically upon default.

We cannot overlook that the statute endorses setting a schedule of periodic payments lasting up to twenty years. See 29 U.S.C. § 1399(c)(1)(B). If, after making timely payments for the first year, the employer ran into financial difficulty and missed two quarterly payments, under the literal language of the Navco opinion the claim for the remainder of the unpaid liability would have accrued at that time. Suppose, however, that the employer regains some financial stability, pays the past due claims, and resumes making timely payments for six years. Thereafter, it ceases all payments. Is the pension fund's claim for the remaining thirteen years of payments now barred because it failed to file suit within six years of the first missed payment? We see nothing in the statutory language that requires the patently inequitable result of permitting an employer to escape much of the twenty years of scheduled withdrawal payments because an action to collect the entire balance is not brought within six years after any one missed payment.

Indeed, such a result would, if accepted, set up perverse incentives. Automatic default on the entire balance

from the date of the first missed payment discourages amicable resolution of disputes and discourages reentry into the fund as a contributing employer. If an employer is late on one payment or misses a payment, must the plan sponsor refuse to accept a late payment and press for the entire balance, even if this pushes the company into insolvency? Forcing the plan sponsor into a position where it must pursue zealous collection efforts at the expense of facilitating negotiations over reentry or waiting for a collective bargaining agreement between the employer and the union undercuts the need for flexibility to ensure solvency.[7]

Although there is no evidence in the record as to industry practice in these circumstances, there appears to be some merit to the argument made in the brief of the Amicus Curiae National Coordinating Committee for Multiemployer Plans in support of the Pension Fund that presumptive default, as adopted by the Seventh Circuit in Navco, will force trustees to accelerate and sue, even though this action may not be in the

---

[7]. There is support in the legislative history that Congress intended to grant some discretion to plan sponsors. Specifically, the House Education and Labor Report notes that the MPPAA purposefully gave plan fiduciaries "a great deal of flexibility to strike a balance among the competing considerations of encouraging new entrants, discouraging withdrawals, easing administrative burdens, and protecting the financial soundness of a fund." H.R. Rep. No. 96-869, 96th Cong., 2nd Sess. 67 reprinted in 1980 U.S.C.C.A.N. 2918, 2935. Furthermore, even if the plan sponsor chooses rules that "would eliminate or reduce liability, the choice of such a rule is not per se a violation of a fiduciary standards [sic]; the determination must be made as to whether the fiduciary has acted reasonably . . . and in accordance with the fiduciary standards." Id.

best interests of plan participants and beneficiaries.  See Amicus NCCMP Brief at 6.

The Pension Fund's position receives support from the decision of the D.C. Circuit in Clyde Sandoz.  871 F.2d at 1120. The court reversed the dismissal of an action brought by the pension fund to recover the assessed withdrawal liability from the employer because the district court had erroneously measured the six-year period from the employer's withdrawal from the fund. In its opinion, the D.C. Circuit held that the cause of action arose from the date upon which the employer failed to make a payment on its withdrawal liability demanded by the plan sponsor. The court reasoned that the action that "adversely affected" the plan was the failure to make the scheduled payment, and that therefore the cause of action accrued at that time.  The court's discussion of the effect of an employer's failure to make a payment that is "due and owing," 29 U.S.C § 1401(b)(1), according to an amortized schedule lends some support to the Pension Fund's argument that the cause of action for individual payments does not accrue until the payment date has passed, because only then is the payment "due and owing" within the statute.  Id. at 1123–24.

The Clyde Sandoz court also referred to the purpose of the MPPAA in its interpretation of the statute, noting that that purpose was to ensure fund solvency by continuing payments under an amortized withdrawal liability schedule of payments.  The court observed that Congress's overriding purpose of ensuring plan solvency was followed by a more general goal of facilitating

collection and a narrower goal of ensuring prompt collection. Id. at 1126.

We are not unaware of the argument that Congress signalled its interest in prompt resolution of withdrawal liability by requiring the plan sponsor to send the withdrawing employer a notice and demand for payment "as soon as practicable" after the withdrawal, see 29 U.S.C. § 1399(b)(1), and that spreading the time to file a complaint for missed payments under the "installment contract" theory of liability would run counter to this intent. But as the Clyde Sandoz court noted and the Congressional history demonstrates, Congress was interested in establishing a balance between different goals. When Congress deems time of the essence, it establishes a statute of limitations considerably shorter than the six-year statute in the MPPAA, see 29 U.S.C. § 1451(f)(1), among the longest in federal statutes. Congress's express authorization to the plan sponsor to establish a lengthy twenty-year period for the schedule of payments, see 29 U.S.C. § 1399(c)(1)(B), provides strong evidence that Congress wanted to give the employer an extended period of time to be able to accrue the funds to pay the withdrawal liability. It is unlikely Congress would have done so had it believed that the beneficiaries of multi-employer funds would suffer drastically if the plan sponsors select payout periods that give the employer up to a twenty-year period to pay out the entire amount due.

We find apt the language used in Clyde Sandoz in rejecting a similar argument that focused on the need for prompt collection of withdrawal liability.  The court stated:

> Sandoz's reading of the purposes and policies animating the MPPAA is curiously one-dimensional.  To be sure, Congress has indicated that promptly collecting outstanding sums is desirable. . . .  The employer's reading of the statute would elevate one narrow statutory policy (favoring prompt collection) over the more general goal (collection) and overriding purpose (solvency) which animate and generate that narrow preference.  There is no indication that the Act requires, as Sandoz would have it, either prompt collection or no collection at all.

871 F.2d at 1126.

Kahle overstates its case when it argues that the installment analysis would give the Fund "limitless time to file a complaint,"  Appellee's Brief at 15, an argument echoed by the dissent.  The Fund is still subject to the six-year statute of limitations.  Thus, a plan sponsor which had established a twenty year payout and chose to wait twenty years to pursue its cause of action would only be able to collect the last six years of installments and would necessarily forego the remainder, a result which should provide adequate disincentive to unnecessary delay. The plan sponsor remains subject to the fiduciary duties placed on it by ERISA and the MPPAA, and it is therefore unlikely that the running of the statute of limitations will be at the plan sponsor's "whim," as the dissent suggests.[8]

---

[8].  We find curious the dissent's concern that under this opinion Kahle will escape payment of over $150,000 (presumably the amount

In light of the statutory language, we reject the district court's holding that the cause of action for all of the unpaid withdrawal liability accrues when the first installment payment is missed. [9]


IV.

CONCLUSION

(..continued)
the dissent calculates was due under the twelve payments from October 1984 through July 1987), dissent typescript op. at 18, when under the dissent's view Kahle would escape payment for the remaining 26 payments, which a rough calculation shows would be more than $250,000, assuming interest as computed by the Fund.

[9]. The dissent appears to suggest that the notice of default sent by the Pension Fund to Kahle on April 23, 1984 could be viewed as the acceleration notice authorized under 29 U.S.C. § 1399(c)(5). Kahle has not so argued nor did the district court so view it. Nothing in the language of the April 23, 1984 letter suggested acceleration. The Pension Fund argues that there is a distinction between the mandatory notice that sets the amount of withdrawal liability and the schedule for repayments, required under 29 U.S.C. §§ 1382, 1399(b)(1), and the discretionary notice of acceleration authorized under 29 U.S.C. § 1399(c)(5), which it contends it sent on August 9, 1988. There is some statutory support for the distinction, as the two notices are in separate provisions, and the acceleration provision would have no significance if the mandatory notice of the amount of withdrawal liability were also to be viewed as a notice of acceleration.

In this case, we need not decide whether the plan sponsor would retain the right to accelerate and sue for the total amount due had it previously brought an action to recover a delinquent payment, because that is not what happened here. The Fund did not bring any earlier suit. Furthermore, because all of the payments accelerated as of the August 9, 1988 notice (from August 9, 1988 to the final payment due January, 1994) are covered by the six-year period before the filing of the complaint (which would sweep back to September 28, 1987), we need not consider the effect of the August 9, 1988 notice. Presumably, the one or two quarterly payments due after the filing of the complaint will be covered by supplement or amendment to the complaint.

We conclude that under the statutory scheme established by the MPPAA, a plan sponsor has six years from the date a payment is due to sue for its recovery. Absent a decision by the Fund to accelerate, the cause of action for payments not yet due does not begin to run when the first such payment is missed. In this case, it is undisputed that the great bulk of the unpaid installments were due by Kahle within six years of the filing of the complaint by the Pension Fund. It follows that the Fund was not time-barred from bringing suit for the total of the quarterly payments which fell due within the six years prior to the filing of this suit.[10]

For the reasons set forth above, we will reverse the grant of summary judgment dismissing the complaint and remand for further proceedings.

---

[10]. Because of the view we take of the dispositive facts, any disputes between the parties as to the effect of the letters sent in 1984 are irrelevant to our disposition. For the same reason, we need not consider equitable arguments raised by the Pension Fund.

Board of Trustees of the District No. 15 Machinists' Pension Fund v. Kahle Engineering Corporation, No. 94-5160

ALARCÓN, Circuit Judge, dissenting:


In this matter, we must decide when a cause of action arises under the MPPAA for the unpaid balance of an employer's liability after the employer has withdrawn from a pension fund. The district court concluded that the clock begins to run from the date an employer first fails to make a scheduled payment. Because the current action for the unpaid balance was filed nine years after the first missed payment, the district court dismissed this matter as barred by the six-year statute of limitations.

The Board of Trustees of District No. 15 Machinists Pension Fund ("Fund") contends that its time for filing an action for the unpaid balance runs six years from the date of the last scheduled payment set forth in the Fund's formal demand letter. Unfortunately, the majority has been persuaded by this argument. The majority holds today that a cause of action for the unpaid balance of an employer's liability to a pension fund is not barred by the statute of limitations if it is filed within six years of the last scheduled payment even if the employer failed to make any quarterly payments for twenty years. Majority opinion at 22. Because it is my view that the majority's decision finds no support in the text of the MPPAA, and is contrary to the law of the Third Circuit regarding the

application of statutes of limitations, I must respectfully dissent.

In the MPPAA, Congress provided two straightforward options to a pension fund when an employer fails to make a scheduled payment on the liability flowing from a withdrawal. The pension fund may bring an action for the missed payment within six years. The pension fund may choose, instead, to bring an action for the entire unpaid balance within six years of the <u>first</u> missed payment.

The majority has created a third option for the pension fund. Under this option, the Fund may elect not to bring an action either for the first missed payment, or for the unpaid balance, within six years of the default. Instead, the pension fund may "cho[o]se to wait twenty years to pursue its cause of action" for the unpaid balance, and would be able "to collect the last six years of installments." Majority opinion at 22.

Contrary to the majority's view, the MPPAA does not place the fixing of the date that the cause of action accrues for the unpaid balance in the exclusive and unreviewable control of the pension fund, regardless of the prejudice to the defendant caused by delay in prosecuting the claim. The MPPAA provides that an action must be filed within six years after the employer defaults. Because this action was filed more than six years after the employer missed its first scheduled payment, I would affirm the district court's order dismissing this action.

I.

Before explaining the rationale that motivates my dissent, I will set forth the facts pertinent to this appeal. Kahle was a member of a multiemployer pension plan sponsored by the Fund. In 1981, Kahle was involved in a labor dispute with its employees. As a result, the company suspended its contributions to the Fund. On April 23, 1984, the Fund determined that the labor dispute had terminated Kahle's obligation to continue making payments. The Fund concluded that Kahle had effected a complete withdrawal from the pension plan. Accordingly, the Fund sent Kahle a notice of its assessment obligation of $271,746 along with a schedule of quarterly payments and a demand for payment of the initial quarterly obligation of $9,467. The payment schedule required that Kahle make thirty-eight additional payments of $9,467, and a final payment of $6,459. The Fund also notified Kahle that the failure to begin payment as required would entitle the Fund to seek immediate payment of the full amount of withdrawal liability.[11]

---

[11]. The relevant portion of the demand letter is as follows:

We have determined that your company has effected a withdrawal from the Fund. In accordance with the Multi-Employer Pension Plan Amendments Act of 1980 (the Act), we hereby make request for payment of withdrawal liability in accordance with the schedule described below.

According to our records, complete withdrawal occurred on June 22, 1981. Based on the method chosen by the Trustees in accordance with the Act, we have computed your company's liability to the Fund to be $271,746.

Kahle made its initial quarterly payment on July 2, 1984. That same day, Kahle informed the Fund that it had not withdrawn. Kahle also requested a review of the Fund's determination that it had completely withdrawn.

On August 2, 1984, the Fund requested that Kahle provide additional information concerning the labor dispute in order that the Fund could investigate Kahle's claim that it did not withdraw. On September 13, 1984, Kahle responded to the Fund's request for additional information and also informed the Fund that it would discontinue making quarterly payments.

On December 20, 1984, Kahle sent the Fund a letter which included a demand to arbitrate the pension dispute. The next day, the Fund sent a letter to Kahle in which it explained that it had found no basis for altering its prior decision that Kahle had completely withdrawn. The Fund also warned Kahle that it had defaulted on its payments and that, if not cured by January 1,

(..continued)
    You are required to pay this amount in quarterly payments,
    each in the amount of $9,467 (except for the last payment
    which will be in the amount of $6,459).

    Payments must begin no later than 60 days after receipt
    of this notice, notwithstanding any request for review
    or appeal. Accordingly, your company's first quarterly
    installment is due on July 1, 1984.

    Failure to begin payment of withdrawal liability as
    required may constitute a default, which will entitle
    the Fund to require immediate payment of the full
    amount of the withdrawal liability owed.

1985, the Fund would declare a default and "seek all remedies available to it" against Kahle.[12]

On December 28, 1984, the Fund's attorney notified Kahle that Kahle's "letter of December 20, 1984, . . . must have crossed in the mails with mine of December 21, 1984."  The Fund's December 28 letter reiterated its position that there was no basis for reversing its conclusion that Kahle had withdrawn from the plan.  The Fund again advised Kahle that it was in default in its payment and stated further that unless the missed payment was made, the Fund would "seek all remedies available to it."

Kahle did not make any further payments nor did it initiate arbitration proceedings.  As the Fund candidly admitted in

---

[12].    The Fund's letter dated December 21, 1984, states:

Since our . . . letter to you of August 2, 1984, the Trustees
    of the District No. 15 Machinists' Pension Fund have met and
    considered your letter of July 2, 1984.

Please be advised that at this time and in part as a result
    of your failure to respond to our earlier letter, the
    Trustees can see no reason for changing their determination
    that your client has withdrawn from the Plan.  Thus, your
    client continues to be obligated to pay its withdrawal
    liability.

Please be further advised that your client is now in
    default in its payments.  Unless it cures this default
    by the 1st of January 1985, our client will have no
    alternative but to declare your client "in default"
    and seek all remedies available to it [sic] client under
    appropriate federal legislation.

argument before the district court, it took no further action

against Kahle until 1988.[13]

On August 9, 1988, the Fund sent Kahle a letter which

stated:

> This letter is to inform you that the company
> is in default in its withdrawal liability
> payments.  We hereby demand, on behalf of the
> Fund, that the company immediately make all
> the past due payments, plus interest.  The
> interest shall be equal to the current prime
> rate, accruing from the date each such
> payment was due.  If you do not make such
> payments, including interest, within sixty
> (60) days from the date you received this
> letter, the Fund will require, in accordance
> with the Multiemployer Pension Plan
> Amendments Act of 1980, immediate payment of
> the total withdrawal liability, plus interest
> accruing from the date the first payment was
> due.  If necessary, the Fund will file an
> action in the United States District Court to
> enforce the company's obligation to pay.

Kahle did not make any payments in response to this second

notification of its default.  Over five years later, and nearly

---

[13].    The following colloquy occurred between the district court
and the Fund's counsel, Ms. Roberto:

```
     THE COURT:      What happened in 1985, '86, '87?  Zero.
     MS. ROBERTO:    Well, the Fund was waiting for--to see
                     what was going to happen with the arbitration
                     with the labor dispute.
     THE COURT:      Waiting for what?  In '85, in '86, in '87?
                     Have you got any papers you want to show
                     me that arbitration was commencing, people
                     were looking for arbitrators and reviewing?
                     Nothing happened.  I think candor on the
                     part of your client is, Nothing happened in
                     '85, '86, '87, so we sent the default in '88.
     MS. ROBERTO:    I don't dispute that.  I have nothing to
                     show you otherwise.
```

nine years after Kahle missed its first payment, on September 28, 1993, the Fund filed this action seeking payment of the unpaid balance of Kahle's withdrawal liability. The district court granted Kahle's motion for summary judgment on the basis that the Fund's action was barred by the six year statute of limitations period in 29 U.S.C. § 1451(f)(1).

## II.

The Fund contends that this action is not barred by the six-year statute of limitations. It argues that its claim for the unpaid balance did not accrue until it gave Kahle notice on August 9, 1988 that if all past-due payments were not made within 60 days, it would file an action for the total well-drained

liability. According to the Fund,
> there are two (2) types of accrual dates for collection of withdrawal liability assessment. One occurs when an installment payment is omitted. At that point the pension fund has the right to bring suit for that one (1) payment. The second is when the pension fund exercises its option to accelerate the outstanding balance after the employers failure to cure a default. If the employer does not meet the pension fund's demand for the entire outstanding balance, a cause of action accrues for the total amount.

Appellant's Opening Br. at 21.

> The Fund asserts that the district court erred by failing to distinguish between the accrual of a cause of action for one installment payment and for the total outstanding amount of the assessment. Although the district court stated that it was following <u>Sandoz</u> when it held that the Pension Fund's cause of action triggering the commencement of the MPPAA's

> six-year statute of limitations accrued in
> October 1984 or December 1984, it actually
> followed the Court of Appeals for the Seventh
> Circuit's decision in Central States Pension
> Fund v. Navco, 3 F.3d 167 (7th Cir. 1993),
> cert. denied, 114 S. Ct. 1062 (1994).

Appellant's Opening Br. at 23-24.

The Fund's reliance on Joyce v. Clyde Sandoz Masonry, 871 F.2d 1119 (D.C. Cir.), cert. denied, 493 U.S. 918 (1989), is misplaced. There is no intercircuit conflict on the issue presented in this case. A careful reading of the Navco and Sandoz decisions demonstrates that these cases do not support the Fund's and the majority's interpretation of the applicable statutes.

In Navco, two pension funds, the Central States, Southeast and Southwest Areas Pension Fund ("Teamsters Fund") and the Chicago Truck Drivers, Helpers and Warehouse Workers Union Pension Fund ("Independent Fund"), filed actions against Navco for withdrawal liability payments. Navco, 3 F.3d at 169. The employers had completely withdrawn from their multiemployer pension funds in January 1984. Id.

On April 6, 1984, the Teamsters Fund sent a formal notice of withdrawal liability and a demand for payment to the employers. Id. at 170. The employers were given sixty days to make the demanded payment. Id. No payments were made in response to the demand. Id. More than seven years after its demand, on May 1, 1991, the Teamsters Fund filed its cause of action. Id.

The district court granted the defendants' motion for summary judgment. Id. The court held that the action was barred

by the six-year statute of limitations, which began to accrue on June 5, 1984, when the demanded payment became delinquent.  Id. On appeal, the Teamsters Fund argued that the district court erred when it held that the claim began to accrue when the payment became overdue.  Id.

On June 19, 1984, the Independent Fund sent the employers a notice, payment schedule, and demand for payment as a result of their withdrawal from the pension fund.  Id.  Pursuant to the schedule, quarterly payments were to begin on July 1, 1984, and continue until July 1, 1986.  Id.  The employers never made any payments.  Id.  Nearly eight years after its demand, on March 13, 1992, the Independent Fund filed its cause of action.  Id.

The district court granted the employers' motion for summary judgment.  Id.  The court held that the Independent Fund's action was barred by the statute of limitations because the claim began to accrue on July 1, 1984.  Id.  The district court rejected the Independent Fund's argument that a claim accrues for the unpaid balance each time the employer fails to make a scheduled quarterly payment.  Id.  On appeal, the Independent Fund asserted that the cause of action began to accrue when it learned the identity of persons within the control group who had the ability to pay the withdrawal liability, as opposed to when the payment became overdue.  Id.  The Independent Fund also reiterated its argument that a cause of action accrued each time the employer failed to make a required quarterly payment.  Id. at 172.

The Seventh Circuit in Navco consolidated the appeals of the Teamsters Fund and the Independent Fund.  Id. at 170.  The Navco court affirmed the grant of summary judgment by both of the district courts.  The Seventh Circuit held that "the claim [for an employer's withdrawal liability] accrues as soon as payment becomes overdue."  Id. at 172.  Because the funds filed their actions more than six years from the date when the employers failed to make their scheduled payments, the Seventh Circuit held that the actions were barred by the statute of limitations.  Id. Additionally, the Navco court rejected the Independent Fund's contention that a claim begins to accrue each time an employer fails to make a scheduled payment.  Id.  The court held that the "pension fund had only one claim against the employer . . . : the amount of withdrawal liability. . . .  [T]he whole amount [of withdrawal liability] is presumptively due at the outset."  Id.

In Sandoz, the trustee of the Bricklayers and Trowel Trades International Pension Fund filed an action to collect the accelerated balance of the employer's pension withdrawal liability.  Sandoz, 871 F.2d at 1121.  Between 1977 and June 30, 1981, Sandoz made payments to the pension fund.  Id.  On July 16, 1981, a new collective bargaining agreement was reached between Sandoz and its employees.  Id.  The agreement did not include an obligation by Sandoz to continue making payments to the pension fund.  Id.  Sandoz made a pension fund payment for work performed

by its employees from July 1 until July 15, 1981.  Id.  Sandoz
made no further payments.  Id.

On July 13, 1987, the fund sent Sandoz a notice of
withdrawal liability along with a payment schedule.  Id.  On the
same day, the fund filed its action.  Id.  On October 8, 1987, the
fund notified Sandoz that it failed to make its scheduled payment
and would be in default unless it paid within sixty days.  Id.
Sandoz did not make any payments in response to the fund's letter.
Id.

The district court dismissed the fund's action because it
was not filed within the six year statute of limitations period.
Id. The district court ruled that the cause of action began to
accrue when the employer completely withdrew from the plan on June
30, 1981.  Id.  On appeal, the fund asserted that the cause of
action began to accrue when the employer failed to make a
scheduled payment after receiving a demand.  Id. at 1122.

The D.C. Circuit in Sandoz vacated the judgment of the
district court.  Id. at 1127.  The court held that
> the [pension] plan is "adversely affected"
> (and thus that a "cause of action" arises)
> when the plan has not received payments which
> are due and owing.  The language of the
> statute points firmly in the direction of the
> conclusion that Sandoz's uncured failure to
> pay the sum demanded adversely affected the
> plan giving rise to a cause of action.

Id. at 1122.  The D.C. Circuit rejected the district court's
determination that the cause of action begins to accrue on the

day the employer completely withdraws from the fund.  Id. at 1123.

Thus, both the Seventh Circuit in Navco and the D.C. Circuit in Sandoz each concluded that a cause of action for withdrawal liability payments under the MPPAA begins to accrue when an employer fails to make a scheduled payment.  Contrary to the Fund's position in this matter, there is no conflict between the Seventh Circuit and the D.C. Circuit regarding the determination as to when a cause of action begins to accrue.  The difference between Navco and Sandoz is that the Navco court expressly rejected an argument which is also raised by the Fund in this case, namely, that a cause of action accrues each time an employer fails to make a scheduled payment after receiving a demand.  Navco, 3 F.3d at 172.  This issue was not presented to the D.C. Circuit in Sandoz.  Neither Navco nor Sandoz support the Fund's argument in this matter that the statute of limitations does not begin to run until six years after the last scheduled payment is due.

Under the MPPAA, after an employer withdraws from a fund, "(1) [a]s soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall--(A) notify the employer of--(i) the amount of the liability, and (ii) the schedule for liability payments, and (B) demand payment in accordance with the schedule."  29 U.S.C. § 1399(b)(1).  The statute further provides:

In the event of a default [of a scheduled payment], a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. For

purposes of this section, the term "default" means—
(A) the failure of an employer to make, when due, any payment under this section, if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure, and
(B) any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability.

29 U.S.C. § 1399(c)(5).

An action under the MPPAA may not be brought more than "6 years after the date on which the cause of action arose." 29 U.S.C. § 1451(f)(1). Pursuant to section 1399(c)(5), the cause of action for the outstanding amount of an employer's liability arises upon the employer's failure to make a scheduled payment. See Navco, 3 F.3d at 172 (claim begins to accrue when a scheduled payment is overdue); Sandoz, 871 F.2d at 1122 (same). However, a pension fund is not permitted to file its action for withdrawal liability payment(s) until it has sent an employer the notice described in section 1399(c)(5). The notice represents a condition precedent which must be satisfied by a fund before it may file its cause of action.

The MPPAA makes clear that a multiemployer pension fund has the option after notifying an employer of a default of (1) filing

an action for a missed payment in accordance with the schedule prepared by the fund after an employer has withdrawn, or (2) filing an action for the total amount that is owing in accordance with the schedule.  A fund has only one claim against an employer. It must decide whether to file an action for the missed payment or the total withdrawal liability.  Navco, 3 F.3d at 172.  The fund is required to file its action for payment of an employer's withdrawal liability within six years of the date when the cause of action arose, i.e., the date of the first missed payment.  Id. This statutory requirement avoids the problem of "improperly plac[ing] the running of the limitations period in the control of the plaintiff."  Board of Trustees of the Constr. Laborers Pension Trust v. Thibodo, 34 F.3d 914 (9th Cir. 1994).

In Thibodo, the defendant, a construction company, made payments to a pension fund until June 15, 1983.  Id. at 916.  In early 1984, the pension fund determined that the company had withdrawn from the fund.  Id.  The fund sent the company an assessment along with a payment schedule.  Id.  However, the company believed that the fund had erroneously determined that it had withdrawn, and the fund ultimately agreed.  Id.

By the spring of 1985, the company had rehired numerous construction workers.  The pension fund subsequently reinstated the company's withdrawal liability assessment.  Id.  The company did not make any pension fund payments.  Id.  In April 1986, the fund sent the company a written notification indicating that the

company had sixty days to begin making payments. Id. The company never made any payments in response to the fund's notification. Id. On June 20, 1989, the fund filed an action for withdrawal liability payments. Id.

The district court stayed the proceedings while the parties submitted the matter to an arbitrator. Id. The arbitrator determined that the company had withdrawn from the pension plan on June 15, 1983 and that Thibodo, the company's sole shareholder, was personally liable for the company's withdrawal liability. Id. Thibodo argued before the district court that the fund had filed its action more than six years after the cause of action accrued and was therefore barred by the statute of limitations. Id. The district court agreed with Thibodo and dismissed the fund's action. Id.

The Ninth Circuit reversed the judgment of the district court. Id. at 918. The court held that the statute of limitations under section 1451(f)(1) begins to accrue "from the date on which the conditions for complete withdrawal specified in § 1383(b)(2) have been met." Id. at 917. The Ninth Circuit recognized that its holding differed from that of the D.C. Circuit in Sandoz, which held that the statute of limitations begins to accrue when the employer fails to make a scheduled payment after receiving a demand from the fund. Id. The Ninth Circuit's decision in Thibodo, however, was concerned with discrete statutory language used by Congress with reference to withdrawals

involving the construction industry.  Id.  Its conclusion that a pension fund cannot manipulate the date when a claim begins to accrue under the MPPAA, however, is consistent with the holding in Navco on this issue.

### III.

In this matter, the Fund's cause of action for the balance of the withdrawal liability arose on October 1, 1984, when Kahle missed a payment after receiving a payment schedule and a corresponding demand.  See Navco, 3 F.3d at 172 (cause of action begins to accrue when a scheduled payment is missed); Sandoz, 871 F.2d at 1123 ("[T]he failure to pay gives rise to a cause of action.").  The Fund had six years from October 1, 1984 to exercise its option to file an action for the missed payment or the total unpaid balance of the employer's withdrawal liability. 29 U.S.C. § 1451(f)(1).

At oral argument, the Fund argued that it was authorized under section 1451(f)(1) to file its action six years after the employer had failed to make the penultimate payment due on October 1, 1993.  The final payment in this matter was due on January 1, 1994.  The Fund's interpretation of section 1451(f)(1) would permit it to wait until the year 2000, approximately sixteen years after the first payment was missed, to file its action for the unpaid balance.  This result would award a pension fund additional time to file its action merely because it was dilatory in pursuing its claim.  See Navco, 3 F.3d at 172 (extending a six year statute

of limitations under Multiemployer Pension Plan Amendments Act of 1980 to twenty-six years "is a job best left to magicians").

Such a result is clearly inconsistent with the public policy served by statutes of limitations. These statutes are designed "to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost," to put potential defendants "on notice of adverse claims," and "to prevent plaintiffs from sleeping on their rights." Sperling v. Hoffman-La Roche, Inc., 24 F.3d 463, 471-72 (3d Cir. 1994) (internal quotation omitted); see also Navco, 3 F.3d at 172 ("Statutes of limitations serve vital social interests--the usual ones of preventing stale claims that may be hard to prove, and protecting the interest of potential defendants in knowing their liabilities, and in the MPPAA the unusual one of protecting the beneficiaries of the fund."). Additionally, permitting a fund to choose the triggering date which begins the running of the statute of limitations essentially makes the fund's dilatory decision unreviewable by a court.

The majority has failed to point to any language in the MPPAA that supports its conclusion that Congress intended to place the running of the statute of limitations in the hands of the pension fund. I agree with the majority that the MPPAA gives a pension fund the option to file an action for a missed payment or an action for the unpaid balance of the employer's liability after

a default.  The fact that Congress gave the pension fund a choice as to the remedy it may follow if a payment is missed, however, does not affect the six-year statute of limitations.

The harm that can flow from delay in filing an action is illustrated by the record in this case.  The majority states that "[t]here is no evidence of further communications, negotiations, or arbitration proceedings after December 1984."  Majority opinion at 11.  The explanation for the absence of a record of the actions taken by the parties following the Fund's December 21, 1984 notice of default is found in the Appellant's Opening Brief.  Counsel explains throughout his brief that correspondence between the parties concerning the employer's withdrawal liability was "not available from the Pension Fund's or Fund counsel's files," Appellant's Opening Br. at 6 n.2, that "[t]here is no information in the Pension Fund's files to indicate course of events before default notice," id. at 10 n.3, and further the "Fund's counsel did not receive the September 13, 1984 letter."  Id. at 5.

The Fund's dilatory tactics in this matter have affected its own ability to prepare for trial.  Moreover, Kahle will now be forced to trial more than ten years after the facts that the Fund alleges make it liable.  Kahle's corporate records, counsel's files, and witnesses' memories are subject to the same loss already experienced by the Fund.

IV.

This court has explained that the goals of the MPPAA are "to protect the interests of participants and beneficiaries in financially distressed multiemployer plans and . . . to ensure benefit security to plan participants." IUE AFL-CIO Pension Fund v. Barker & Williamson, 788 F.2d 118, 127 (3rd Cir. 1986) (internal quotation omitted). The majority's interpretation of section 1399(c)(5) seriously frustrates Congressional intent.

Congress' concern that a pension fund act promptly in protecting the integrity of the pension plan is reflected in the requirement that the demand for payment of the employer's liability after a withdrawal be made "as soon as practicable." 29 U.S.C. § 1399(b)(1). The majority's conclusion that a fund may delay filing an action for the total amount of the outstanding liability for up to twenty years is contrary to the expressed concern of Congress that a pension fund take timely action to resolve a dispute concerning an employer's liability.

In construing section 1399(c)(5) to place the running of the statute of limitations in the hands of the pension plan, the majority would apparently approve of the loss of fourteen years of payments owed by the employee to the Fund. The majority's construction of the MPPAA is clearly inconsistent with the congressional goal of safeguarding the financial integrity of the multiemployer plan. The Seventh Circuit's interpretation of section 1399(c)(5) in Navco ensures that an employer who misses a payment must make up that payment within sixty days of the

scheduled date, or be subject to an action for the total unpaid balance of its withdrawal liability. Had the Fund filed its action within six years of the first missed payment in this matter, Kahle would have been liable to pay over $270,000. Under the majority's view, Kahle will escape payment of over $150,000. This will unfairly force the other participants to increase their contribution to protect the beneficiaries of the Fund. Traditional canons of construction require us to construe a statute to avoid a result that defeats congressional intent. Adoption of the reasoning in Navco would fully protect the interests of the beneficiaries of a pension plan.

V.

The notice requirement in section 1399(c)(5) is solely applicable to a cause of action for the total unpaid balance of an employer's withdrawal liability. Thus, the Fund's December 21, 1984 threat to "seek all remedies available to it" could only refer to an action for the total unpaid balance. As conceded by the Fund, the MPPAA does not require service of a notice of default where the pension plan elects to bring an action for a misconduct. Appellants Opening Br. at 21.

The Fund attempts to escape the consequences of its failure to file this action within the six-year limitation period by arguing that the notice of default it sent to Kahle dated December 21, 1984 was "defective," and therefore did not trigger the running of the statute of limitations. Appellant's Opening Br. at

29. This argument is frivolous. To accelerate payment of the outstanding withdrawal liability pursuant to section 1399(c)(5), the plan sponsor must give the employer written notification of its failure to make any payment when due. The Fund's December 21, 1984 letter informed Kahle's counsel "that your client is now in default in its payments." The letter further advised Kahle that unless the default was cured, the Fund would "seek all remedies available to it." The December 21, 1984 letter substantially complied with the notice of default requirements of section 1399(c)(5). The running of the statute of limitations for the total unpaid balance was therefore triggered by the December 21, 1984 notice of default.

## VI.

The majority finds support for its conclusion that the statute of limitations for the total unpaid balance begins to run anew from the date of each scheduled payment in the common law of contracts. The Seventh Circuit rejected a similar argument in Navco:

> The schedule under § 1399(c) . . . is not contractual; the employer did not assent to a longer period for payment and suit. We have not seen any case extending the contractual approach to the MPPAA, and like the district court we believe it would be imprudent to adopt a rule that relieves pressure on trustees of pension funds to act with dispatch. Six years is quite sufficient; the trustees may not award themselves more.

Navco, 3 F.3d 167–68.

I would not borrow from the law of contracts to negate the intent of Congress that pension funds must act promptly to avoid compromising the financial integrity of the pension fund and requiring other participants to shoulder the responsibility of employers who withdraw. The majority's reliance on the arbitrator's decision in Ludington News Co. and Michigan UFCW/Drug Employers Pension Fund Workers Union and Drug and Mercantile Employee Joint Pension Fund, 9 Employee Benefits Cas. (BNA) 1913 (1988), to support its contractual theory is questionable. The majority states "[a]lthough we recognize that Ludington is without precedential effect, it was cited as relevant by another circuit. See Joyce v. Clyde Sandoz Masonry, 871 F.2d 1119, 1124 (D.C. Cir.), cert. denied, 493 U.S. 918 (1989)." Majority opinion at 14-15. A careful reading of Sandoz, however, reveals that Ludington was not "cited as relevant" for the proposition that a new cause of action for the unpaid balance accrues when each scheduled payment is due. That issue was not discussed by the court in Sandoz. Instead, Ludington was cited because it, too, concluded that no cause of action arises until the employer refuses to meet the demand of the fund. Sandoz, 871 F.2d at 1124. As noted above, the analogy to the law of contracts adopted by the majority in this matter was expressly rejected by the Seventh Circuit. Navco, 3 F.3d at 172-73.

CONCLUSION

Contrary to the majority's resolution of the issue before this court, the MPPAA does not permit a pension fund to file a cause of action for the unpaid balance of an employer's withdrawal liability six years after the last payment is due, even if no payments have been made for up to twenty years.  Regrettably, the majority has subjected the running of the statute of limitations to the whim of the Fund.  I find nothing in the law of the Third Circuit or any other jurisdiction that supports this extraordinary result.  Accordingly, I cannot join in the majority's opinion.  I would affirm the well reasoned judgment of the district court.