**TEAMSTERS PENSION TRUST FUND OF PHILADELPHIA and Vicinity by Charles J. Schaffer, Jr.**

v.

**BRIGADIER LEASING ASSOCIATES; Alvin Bodford; Epes Carriers, Inc.; and, Epes Transport Systems, Inc.**

Civ. A. No. 94–1847.

United States District Court, E.D. Pennsylvania, Civil Division.

March 24, 1995.

Kent Cprek, Philadelphia, PA, for plaintiff.

Alan M. Kintisch, Steven D. Spencer, Philadelphia, PA, for defendant.

## MEMORANDUM

DuBOIS, District Judge.

Table of Contents

I.  Introduction............................................................... 391
    A.  Procedural History and Background .......................................... 391
    B.  The Defendants ......................................................... 392

II.  MPPAA Withdrawal Liability................................................. 392

III.  Arbitration............................................................... 393
    A.  *Flying Tiger* and *Doherty* ............................................. 393
    B.  Date of Withdrawal ...................................................... 394
    C.  Controlled Groups ....................................................... 394
        1.  Epes Carriers, Inc. and
            Epes Transport System, Inc................................................ 394
            a.  The "Option Contract" ............................................. 394
            b.  Post–Withdrawal Common Control ..................................... 395
        2.  Brigadier and Bodford ................................................ 396

IV.  Statute of Limitations .................................................... 397

V.  Notice and Demand ......................................................... 397

VI.  Employer Status at Time of Withdrawal ..................................... 399
    A.  Brigadier and Bodford.................................................... 399
    B.  Epes Carriers, Inc. and Epes Transport System ............................. 402

VII.  Conclusion ............................................................... 402

---

Presently before the Court are defendants' Motion to Dismiss and plaintiffs' Cross–Motion to Dismiss or Stay Pending Arbitration. Both Motions will be denied for the following reasons.

## I.  Introduction

### A.  Procedural History and Background

This case forms part of the extensive litigation arising under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq.,* that grew out of the withdrawal of Hall's Motor Transit Co. ("Hall's") from a number of multiemployer pension funds. *See, e.g., Flying Tiger Line, Inc. v. Central States, S.E. & S.W. Areas Pension Fund,* 704 F.Supp. 1277 (D.Del.1989).

The facts and procedural history may be summarized as follows:

Hall's was an interstate trucking company that contributed on behalf of covered employees to various multiemployer pension funds including that of plaintiff Teamsters Pension Trust Fund of Philadelphia and Vicinity ("the Fund"). On March 10, 1986, Hall's filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.,* and subsequently reduced and then ceased contributing to the pension funds.

From January 1980 to January 1985, Hall's was a wholly-owned subsidiary of Tiger International, Inc. ("Tiger"). Anticipating that the pension funds would assert that Tiger was jointly and severally liable for Hall's withdrawal liability, Tiger and its subsidiaries filed a complaint in July 1986 in the United States District Court for the District of Delaware seeking declaratory and injunctive relief against various pension funds including the Fund. Tiger alleged that it was not liable to any pension funds as a result of Hall's withdrawal. Tiger ultimately settled with all the pension funds in that case except for the Fund.

By late 1987, Hall's ceased contributing to the Fund, and on January 20, 1988, the Fund sent Tiger a notice and demand for payment of Hall's withdrawal liability which the Fund assessed at approximately $2.1 million. The Delaware District Court referred the dispute between the Fund and Tiger to arbitration. On December 22, 1993, the arbitrator issued a decision in Tiger's favor. That decision is currently on appeal in the Delaware District Court.

On March 21, 1994, the Fund and Charles J. Schaffer, a fiduciary of the Fund, filed the instant action against defendants Alvin Bodford, Brigadier Leasing Associates, Epes Transport System, and Epes Carriers, Inc., "as a protective matter following an adverse

arbitration award." Pl.Surreply Mot.Dism. at 26. An Amended Complaint was filed on March 28, 1994. The Amended Complaint alleges that under MPPAA's provisions, defendants and Hall's were businesses under common control at the time of withdrawal and are therefore jointly and severally liable for Hall's withdrawal liability. Jurisdiction is based on 29 U.S.C. § 1451(c), which gives federal district courts jurisdiction over civil actions arising under MPPAA.

### B. The Defendants

In December 1984, defendant Alvin Bodford ("Bodford"), then Chief Financial Officer of Hall's, and other senior members of Hall's management formed the Hall's Acquisition Corporation ("HAC") as part of a planned buyout of Hall's from Tiger. Tiger transferred 75% of Hall's stock to HAC in January 1985 for $1,000 and a secured note for $10.5 million of existing inter-company debt. Tiger transferred its remaining 25% of Hall's stock to HAC in December 1985. According to defendants, HAC returned the latter 25% of Hall's stock to Tiger in March 1986 because the transfer constituted a default under various agreements to which Hall's was a party. Defendants claim that the transfer of this 25% of Hall's stock was not consummated until May 1988.

Defendant Brigadier Leasing Associates ("Brigadier") was formed in June 1985 as a limited partnership with one general partner. Under the express terms of the partnership agreement, the purpose of the partnership was to lease 70 GMC Brigadier tractors to Hall's. See Pl.Mem.Opp.Mot.Dism.Ex. 9 at 3–4. Alvin Bodford was general partner of Brigadier at all times. According to defendants, shortly after Hall's filed its petition under Chapter 11 of the Bankruptcy Code in March 1986, Brigadier sold all of its tractors and ceased all business other than winding up the affairs of the partnership. The final distribution of the remaining assets was made on October 19, 1987, and the partnership ceased to exist at that time.

In July 1987, Bodford and the F.R. Langley Family Trust ("the Trust"), by its trustee Phyllis Brown, created defendant Epes Carriers, Inc. ("ECI"), with the stock ownership and voting control evenly divided between Bodford and the Trust. In September 1987, ECI purchased all the stock of defendant Epes Transport System, Inc. ("ETS"), a trucking company. In May 1988, Bodford acquired the Trust's interest in ECI and became sole owner of ECI.

### II. MPPAA Withdrawal Liability

MPPAA was enacted in 1980 as an amendment to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. MPPAA requires employers who withdraw from a multiemployer pension plan to pay their portion of the unfunded vested benefits of that plan. Under ERISA, the term "employer" encompasses any trade or business under common control with the organization whose withdrawal triggers the liability. 29 U.S.C. § 1301(b)(1). A pension plan may demand and collect withdrawal payments from any such trade or business.

ERISA provides that the term "trades or businesses ... under common control" is to be defined by regulations promulgated by the Internal Revenue Service. 29 U.S.C. § 1301(b)(1). The regulations define three types of controlled groups. First, a parent-subsidiary controlled group is formed when one person or organization has a controlling interest, i.e., an 80% or greater interest, in another organization. 26 C.F.R. § 1.414(c)–2(b). Second, a brother-sister group is formed by two or more organizations where five or fewer persons own a controlling interest in each organization and such persons are in effective control of each organization. 26 C.F.R. § 1.414(c)–2(c). Effective control is found where the sum of the lowest percentage interest of each person in each organization is 50% or more. Third, a combined group of common control is formed by three or more organizations where each organization is a member of either a parent-subsidiary or brother-sister group and at least one organization is simultaneously a member of a parent-subsidiary and brother-sister group. 26 C.F.R. § 1.414(c)–2(d).

The Fund alleges that Hall's and the defendants formed a combined group of common control as follows: HAC wholly owned Hall's, and thus HAC and Hall's form a

parent-subsidiary controlled group. HAC and ECI form a brother-sister controlled group because, according to plaintiffs, Alvin Bodford owned a controlling interest in and had effective control of both firms. ETS is a wholly-owned subsidiary of ECI and forms a parent-subsidiary control group with ECI. HAC and Brigadier formed a brother-sister group because, according to plaintiffs, Bodford and two other investors owned a controlling interest in and had effective control of both firms. Together, Hall's, HAC, and defendants ECI, ETS, and Brigadier formed a combined group of trades or businesses under common control and a single MPPAA employer. As general partner of Brigadier, Bodford is personally liable for the withdrawal liability of Brigadier.

The parties have agreed that defendants' Motion to Dismiss should be treated as a motion for summary judgment because the Motion is based on evidence beyond the scope of the pleadings. *See* Fed.R.Civ.P. 12(b). Plaintiffs, in turn, have filed a motion pursuant to Fed.R.Civ.P. 41(a)(2) to dismiss the Amended Complaint without prejudice or, in the alternative, to stay proceedings, pending arbitration.

### III. Arbitration

Plaintiffs maintain that all issues in the case, including those involving the statute of limitations and notice, must be arbitrated, and that, as a result, the action should be dismissed without prejudice, or in the alternative, stayed, pending arbitration. Because arbitrability is a threshold issue, the Court will first address plaintiffs' Motion. The Motion will be denied because defendants have presented evidence that they were never part of a group of trades or businesses under common control with Hall's and therefore are not subject to the MPPAA arbitration provisions.

#### A. *Flying Tiger* and *Doherty*

MPPAA requires arbitration of "[a]ny dispute between an *employer* and the plan sponsor ... concerning a determination made under sections 1381 through 1399 of [title 29]." 29 U.S.C. § 1401(a)(1) (emphasis added). Because the statute applies specifically

to employers, courts have held that parties who present evidence they were not a MPPAA employer prior to withdrawal are not subject to the MPPAA arbitration provisions.

In the related case of *Flying Tiger Line, Inc. v. Teamster Pension Trust Fund of Philadelphia*, 830 F.2d 1241, 1250 (3d Cir. 1987), the plaintiff—who was seeking a judicial declaration that it was not liable to various pension funds—argued that it was not subject to arbitration because it was not a MPPAA employer on the date of withdrawal. Writing for the court, Judge Higginbotham reasoned that "where the party against which withdrawal liability is being asserted was *certainly* part of the controlled group of an employer subject to MPPAA at some point in time, and where the issues in dispute fall within the purview of MPPAA provisions that are explicitly designated for arbitration, the Act's dispute resolution procedures must be followed." *Id.* at 1247 (emphasis added). Judge Higginbotham carefully distinguished between the issue of whether the defendant was never a MPPAA employer and the issue of whether the defendant had ceased to be a MPPAA employer before the date of withdrawal. *Id.* at 1250 (quoting *Banner Indus., Inc. v. Central States, S.E. & S.W. Areas Pension Fund*, 657 F.Supp. 875 (N.D.Ill. 1987)). The former is a question for the district court to decide, while the latter falls within the arbitrator's jurisdiction. The Third Circuit concluded that Tiger had been a MPPAA employer at one time prior to withdrawal, and thus the question whether Tiger was a MPPAA employer at the time of withdrawal was arbitrable.

Judge Higginbotham's "certainly" language was followed in *Doherty v. Teamsters Pension Trust Fund of Philadelphia and Vicinity*, 16 F.3d 1386 (3d Cir.1994), where the court held that a defendant that was not "certainly" a MPPAA employer at some time may not be compelled to arbitrate at the outset because the district court must first determine the applicability of the MPPAA arbitration scheme. *Id.* at 1390. "The distinction rests on the fact that § 1401(a)(1) mandates arbitration for disputes between 'an *employer* and the plan sponsor,' and an

entity that is not an MPPAA employer because it has never been in a controlled group with the contributing entity is not subject to arbitration." *Id.* (citations omitted); *see also Teamsters Joint Council No. 83 v. Centra,* 947 F.2d 115, 122 (4th Cir.1991); *Bowers v. Transportacion Maritima Mexicana, S.A.,* 901 F.2d 258, 261 (2d Cir.1990); *Banner,* 657 F.Supp. at 882.

According to plaintiffs, *Doherty* does not require the district court to decide the employer status issue if such a determination entails adjudication of issues of fact. That is, an arbitrator must resolve all issues of fact regardless of whether the party against whom liability is asserted can present evidence that it was never a MPPAA employer.

■ Plaintiffs misunderstand *Doherty* and misinterpret 29 U.S.C. § 1401(a)(1). *Doherty* holds that unless a party was certainly a MPPAA employer prior to withdrawal, the district court must first decide whether the dispute is "between an employer and the plan sponsor." 29 U.S.C. § 1401(a)(1). Plaintiffs' theory that arbitration must be ordered whenever a dispute requires adjudication of issues of fact ignores the threshold requirement, imposed by § 1401(a)(1) and recognized by *Doherty,* that arbitration be applied only to disputes between an employer and a plan sponsor.

The Court concludes that it must first determine whether any or all defendants were MPPAA employers prior to withdrawal. Until that issue is resolved, arbitration may not be imposed under 29 U.S.C. § 1401(a)(1).

### B. Date of Withdrawal

■ Under MPPAA, the date of withdrawal is defined as "the date of the cessation of the obligation to contribute or the cessation of covered operations." 29 U.S.C. § 1383(e). The Third Circuit has held that "substantial cessation of normal business activity" constitutes withdrawal. *Crown Cork & Seal Co. v. Central States S.E. & S.W. Areas Pension Fund,* 982 F.2d 857, 865–66 (3d Cir.1992). Thus, a court may find that withdrawal has occurred where an employer ceases its normal business operations in preparation for a total shut down but maintains a minimal

number of employees to assist with the shut down. *Id.*

Defendants contend that Hall's withdrawal occurred during the final week of October 1987. In support of this position, defendants have submitted audit reports of Hall's during the year 1987 which show a sharp decline in man-hours and contributions to the Fund after October 1987. Def.Reply Mot.Dism.Ex. 1. Plaintiffs have not offered evidence of any withdrawal date more specific than the year 1987.

The Court cannot determine the withdrawal date on the present state of the record. First, plaintiffs represent that they have not completed discovery on this issue. Second, defendants have not presented evidence as to what the normal level of business operations was for Hall's and whether the changes that took place in October of 1987 signified a cessation of normal business operations in preparation for a shut down. Therefore, in analyzing whether the individual defendants were ever a controlled group member prior to withdrawal, the Court will assume *arguendo* that plaintiffs' position is correct and that withdrawal could have occurred at any point in 1987.

### C. Controlled Groups

#### 1. Epes Carriers, Inc. and Epes Transport System, Inc.

##### a. The "Option Contract"

■ On July 2, 1987, defendant Alvin Bodford and the Langley Trust, through its trustee Phyllis Brown, formed Epes Carriers, Inc. ("ECI"), with the stock ownership and voting control evenly split between Bodford and Brown. On September 30, 1987, ECI acquired complete control of Epes Transport System, Inc. ("ETS"), a trucking company. Defendants contend, and it is not disputed, that neither the Trust nor any Trust beneficiary has ever owned an interest in Brigadier, Hall's, or HAC. Defendants also contend, and it is not disputed, that no ETS shareholder prior to its acquisition by ECI has ever owned an interest in Brigadier, Hall's, or HAC.

On May 25, 1988, Phyllis Brown sold the Trust's 50% interest in ECI to Bodford, thus

giving him 100% ownership of ECI. It is plaintiffs' position that this 1988 transaction somehow shows that ECI and HAC were under common control in 1987.

First, plaintiffs claim that the transfer of the Trust's stake in ECI to Bodford was pursuant to a stock transfer restriction agreement made some time in 1987. Plaintiffs have produced an unsigned draft of a "Stock Purchase and Restriction Agreement" dated September 18, 1987. The relevant portion of the draft provides as follows:

4. *Sale of Shares Between Restricted Shareholders.*

(a) At any and all times during the term of this Agreement, a Restricted Holder shall have the right to offer to purchase the Shares of any other Restricted Holder, and the Restricted Holder receiving such offer shall be required to either sell his Shares or purchase the Shares of the Restricted Holder making such offer in accordance with the terms and provisions of this *Paragraph 4.* For purposes of the remainder to as the "Offeror" and the Restricted Holder receiving such offer shall be referred to as the "Offeree."

. . . .

(c) Upon receipt of an offer from an Offeror to purchase his Shares, the Offeree shall have the option, at his sole discretion, to either accept such offer or to purchase the Shares of the Offeror under the same terms and conditions as contained in the Offeror's offer; provided, however, that the Offeree must elect to purchase all, and not less than all, of the Shares then owned by the Offeror. . . . In the event the Offeree exercises his right and option to purchase the Shares of the Offeror, the Offeror shall be required to sell his Shares to the Offeree in accordance with the terms and conditions of this *Paragraph 4.*

Pl.Mem.Opp.Mot.Dism.Ex. 13. According to plaintiffs, this agreement constituted an option contract by which Bodford acquired an option for the Trust's interest in ECI. The existence of an option contract is relevant to the controlled group issue because, for the purposes of MPPAA, a person who has an option to acquire stock is considered to own such stock. *See* 26 U.S.C. § 1563(e)(1); *IUE*

*AFL–CIO Pension Fund v. Barker & Williamson,* 788 F.2d 118, 123 (3d Cir.1986).

Plaintiffs have presented no direct evidence that the draft or any stock transfer restriction agreement or option contract was ever signed. It is plaintiffs' position that "[a]s Bodford admittedly purchased the entire interest of the Langley Trust by May, 1988, we infer that an option agreement existed, even if never formally signed, for purposes of the present opposition to Defendants' motion." Pl.Mem.Opp.Mot.Dism. at 23. Plaintiffs also maintain that the fact that a copy of the unsigned draft was given to the Metro North State Bank while Bodford was seeking a $3.5 million dollar loan which the Bank ultimately approved establishes the existence of an actual, binding agreement between Bodford and Brown. Transcript of Oral Argument of Oct. 24, 1994 at 31–32 [hereinafter "Transcript"]. To counter such evidence, defendants have submitted affidavits from Alvin Bodford and from Robert M. Hickey, the Property Manager for the Langley Trust, in which they explicitly deny that the Trust and Bodford ever entered into any agreement restricting the sale or transfer of ECI stock. *See* Def.Reply Mot.Dism.Exs. 5 & 8.

The Court does not agree with plaintiffs' contention that the unsigned draft agreement or the bank loan show that ECI and ETS were "certainly" part of a controlled group with Hall's. There is simply no evidence that the parties actually entered into the agreement or into any option contract prior to any possible withdrawal date. In the absence of such evidence, the Court cannot conclude that Bodford ever owned an option to purchase the Trust's interest in ECI. Plaintiffs thus have failed to establish that Bodford owned a controlling interest in ECI at any time prior to withdrawal and that ECI was under common control with Hall's.

**b. Post–Withdrawal Common Control**

■ Plaintiffs next argue that arbitration is appropriate for ECI and ETS because they formed a controlled group with Hall's after Bodford acquired full control of ECI in late May 1988—months after any possible withdrawal date. In support of this position,

plaintiffs rely on the *Flying Tiger* and *Doherty* opinions which state that the defendants need be a MPPAA employer only "at some point in time." *Flying Tiger*, 830 F.2d at 1247; *Doherty*, 16 F.3d at 1390 ("at one time"). Defendants argue that *Doherty* and *Flying Tiger* logically must refer only to time prior to and encompassing the date of withdrawal, because liability attaches only to trades or businesses that are part of the controlled group at the time of withdrawal.

■ The Court agrees with defendants that a MPPAA employer's relationship with other trades or businesses following withdrawal is not relevant to withdrawal liability. Withdrawal liability is imposed only on those trades and businesses that are under common control with the withdrawing employer on the date of withdrawal. A trade or business that becomes part of a controlled group with the employer *after* the withdrawal has no obligation to contribute and is never a contributing MPPAA employer. Thus, *Doherty* requires arbitration only for trades or businesses under common control with a MPPAA employer prior to withdrawal.

This reading of *Doherty* is supported by an earlier Third Circuit case, *Board of Trustees of Trucking Employees of North Jersey Welfare Fund v. Centra*, 983 F.2d 495 (3d Cir. 1992), which involved a defendant who acquired a MPPAA employer which at some point incurred withdrawal liability. The defendant argued that it had not acquired control of the withdrawing organization until after the date of withdrawal and thus was not itself liable under MPPAA. In other words, the question was whether a defendant that was part of a controlled group at some time, possibly before withdrawal and certainly after withdrawal, could be ordered into arbitration. In affirming the district court, the Third Circuit held that the issue whether the defendant had acquired control by the date of withdrawal was properly determined by the district court. "Whether a corporation has acquired control of a contributing employer by the date the contributing company withdraws from a multiemployer pension fund is a legal question for a district court to decide. We have distinguished this question from the question of whether a business, once a member of a control group, has relinquished its control prior to the withdrawal date." *Id.* at 501. Implicit in the *Centra* court's reasoning is the concept that "at some point in time" does not extend to the post-withdrawal period.

For these reasons, the Court concludes that plaintiffs are not entitled to arbitrate their claims against ECI or ETS, because defendants have presented evidence that neither ECI nor ETS was a member of a group under common control with Hall's prior to withdrawal. Accordingly, the Court will deny plaintiffs' Motion as to ECI and ETS.

## 2. Brigadier and Bodford

■ Plaintiffs contend that Brigadier and HAC certainly formed a brother-sister controlled group at some time prior to withdrawal. Specifically, plaintiffs maintain that Bodford, along with Thomas M. Fraticelli and David Quidort, owned more than 80% of HAC and Brigadier. Defendants deny that Bodford, Fraticelli, and Quidort ever owned more than 80% of HAC and Brigadier. The parties have presented the Court with sharply contrasting figures which they claim represent the interest owned by Bodford, Fraticelli, and Quidort in HAC and Brigadier at various times in 1987.

The Court concludes that a genuine issue of material fact exists as to whether Brigadier was under common control with HAC and Hall's at some time prior to withdrawal. Accordingly, plaintiffs' Cross–Motion to Dismiss or Stay Pending Arbitration will be denied as to Brigadier. Because Bodford was sued in his capacity as general partner of Brigadier, the Court will also deny plaintiffs' Motion as to Bodford.[1]

1. Defendants also ask the Court to sanction plaintiffs' counsel pursuant to 28 U.S.C. § 1927 on the grounds that plaintiffs' Motion constitutes a bad faith delay. *See* 28 U.S.C. § 1927 (authorizing courts to impose costs when counsel "multiplies the proceedings ... unreasonably and vexatiously"). The Court finds that plaintiffs' Motion was not filed in bad faith and will therefore deny defendants' request. *See Williams v. Giant Eagle Markets, Inc.*, 883 F.2d 1184, 1191 (3d Cir.1989) (courts must find "willful bad faith" before imposing sanctions under § 1927).

## IV. Statute of Limitations

■ In their Motion to Dismiss, defendants argue that plaintiffs' claims for withdrawal liability are barred under the six-year MPPAA statute of limitations because Hall's withdrew from the Fund at some point in 1987 and this action was commenced in March 1994.

■ Under MPPAA, any plan fiduciary, employer, plan participant, or beneficiary "who is *adversely affected* by the act or omission of any party under this subtitle with respect to a multiemployer plan," may bring a civil action within six years "after the date on which the cause of action arose." 29 U.S.C. § 1451 (emphasis added). The language of the statute thus requires that the aggrieved party suffer some adverse effect before the six-year limitations period begins to run. *Joyce v. Clyde Sandoz Masonry,* 871 F.2d 1119, 1124 (D.C.Cir.1989), *cert. denied,* 493 U.S. 918, 110 S.Ct. 280, 107 L.Ed.2d 260.

The parties differ as to what adverse effect triggers the statute of limitations. Plaintiffs argue that a cause of action does not accrue until a demand for withdrawal liability payment goes unmet. Defendants contend the statute runs from the date of withdrawal.

In *Board of Trustees of the District No. 15 Machinists' Pension Fund v. Kahle Eng'ing Corp.,* 43 F.3d 852 (3d Cir.1994), the Third Circuit addressed the issue whether the MPPAA statute of limitations begins to run for the entire amount of withdrawal liability when the employer first misses an installment payment. In that case, the employer ceased contributing to the plaintiff pension plan in 1981. Three years later, the plan notified the employer that the employer had effected withdrawal and owed withdrawal liability to be paid out over a period of slightly more than nine years. The employer advised the plan that it had not withdrawn and ultimately demanded arbitration. The record evidenced no further negotiation or arbitration after December 1984, and the employer did not make any withdrawal liability payments. In 1988 the plan notified the employer that it was in default and threatened to demand immediate payment of the entire withdrawal liability. In September 1993, the plan brought suit. The district court dismissed the case on the employer's motion for summary judgment on the ground that all claims for withdrawal liability were barred by the six-year MPPAA statute of limitations. On appeal, the *Kahle* court held that a "cause of action arises from the date each payment is missed." *Id.* at 857. Thus, "the statute of limitations runs against each installment from the time it becomes due, that is, from the time when an action might be brought to recover it." *Id.* Accordingly, the Third Circuit concluded the district court erred in ruling that the action was time-barred because the plan was entitled to sue for installments that became due within the six-year period preceding the commencement of suit.

■ It is clear from the *Kahle* decision that in the Third Circuit, the MPPAA six-year statute of limitations will generally begin to run from the time that an installment becomes due and not from the date of withdrawal. *See also Joyce v. Clyde Sandoz Masonry,* 871 F.2d at 1124. However, defendants have raised the argument that the *Kahle* court did not address the issue of when the limitations period begins to run where no valid demand for withdrawal liability payments has been made. In *Kahle,* it was never disputed that the employer had received proper notice of withdrawal liability. Defendants' theory, it appears, is that the Fund failed to give proper notice, and that where proper notice is not given in a timely manner, any action for any portion of the withdrawal liability is time-barred. Because a genuine issue of material fact exists with respect to notice, *see infra* Part IV, the Court will not address this argument at this time and will deny defendants' Motion with respect to the statute of limitations.

## V. Notice and Demand

MPPAA requires the pension plan sponsor to notify the employer of the amount of its withdrawal liability and the schedule for liability payments and to demand payment according to the schedule. 29 U.S.C. § 1399(b)(1). The notice and demand must be given "as soon as practicable" after the employer withdraws. *Id.* Defendants con-

tend that the Fund has never made a proper notice or demand.

Plaintiffs allege that defendants were notified by a letter dated January 20, 1988, a copy of which is attached to the Amended Complaint. The letter was written by Charles Schaffer, the Fund Administrator, and is addressed to "Tiger International, Inc." with carbon copies to Hall's Motor Transit, "Other Listed Affiliates," and James Peck, Esq., who was counsel for Hall's at that time. The letter states, in relevant part, "We have determined that the employer(s) including Hall's Motor Transit Company effected a complete withdrawal from the Teamsters Pension Trust Fund of Philadelphia and Vicinity (the Fund) during the 1987 Plan Year. . . . As required under [ERISA], as amended by [MPPAA], we hereby make demand for payment of withdrawal liability." The letter continues:

> This determination is addressed and applicable to [Tiger] and [Tiger's] affiliates under common control in the period September 26, 1980 to December 31, 1984, including:
>
> The Flying Tiger Lines, Inc.
>
> Warren Transport, Inc.
>
> Tiger Leasing Group
>
> Tiger Air, Inc.
>
> This demand is not applicable to Hall's and other debtor entities to the extent prohibited by the Bankruptcy Code.

The letter notes that, under MPPAA, trades or businesses under common control with the withdrawing employer are liable as a MPPAA employer. The letter demands a specific amount of withdrawal liability, $2.1 million, and sets forth a schedule for payment.

This case presents two issues with respect to notice: (1) whether defendants received a copy of the January 20, 1988, letter; and (2) whether the letter presented a demand for payment from Tiger alone, or whether it also demanded payment from Hall's.[2]

■ Because MPPAA treats all members of a group of trades or businesses under common control as a single employer, actual notice and demand to one member of the group constitutes constructive notice and demand to all members. *I.U.E. A.F.L.–C.I.O. Pension Fund v. Barker & Williamson, Inc.,* 788 F.2d 118, 128 (3d Cir.1986); *Trustees of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc.,* 862 F.2d 1020, 1024 (3d Cir. 1988) ("Notice to one member . . . constitutes notice to every member of that group."). In *Barker & Williamson,* the Third Circuit reasoned that a pension fund "can only be expected to provide notice to the corporation that is the ostensible employer of the fund's participants. A pension fund has no way of knowing the ownership of a closely held corporation. . . . Holding the fund responsible for providing notice to all other possible entities that might subsequently be deemed to be in a controlled group with the employer corporation would place the fund in an untenable position." *Barker & Williamson,* 788 F.2d at 128. The Court further noted that, as a general rule, MPPAA notice provisions should be construed liberally to protect pension plan participants because ERISA and MPPAA are remedial statutes.

In the instant case, defendants argue that the January 20, 1988, letter is not effective notice because (1) it was addressed only to Tiger, and (2) it was not sent to defendants or their counsel. Notice to Tiger of Hall's withdrawal liability would not have constituted notice to Hall's because the Tiger was not a MPPAA employer on the date of withdrawal. However, plaintiffs contend, and defendants admit, that a copy of the letter was mailed to and received by Hall's counsel. *See* Def.Reply Mot.Dism. at 19. It is not clear from the record whether a copy of the letter was directly mailed to Hall's, although the letter lists Hall's as a carbon-copy recipient.

The Court concludes, in accordance with *Barker & Williamson,* that so long as Hall's

2. The parties have suggested the possibility that the Amended Complaint could constitute notice and demand, or alternatively, that the Fund could give notice and demand at the present time. There is no reason to address that possi-

bility on the present state of the record, but the Court notes that such an argument would raise an issue as to timeliness. *See* 29 U.S.C. § 1399(b)(1) (notice and demand must be given "as soon as practicable").

counsel or Hall's received a copy of the letter, all trades or businesses under common control with Hall's received notice for the purposes of MPPAA. Thus, if the defendants were under common control with Hall's at the time of withdrawal and Hall's actually received a copy of the letter, defendants also received a copy of the letter for the purposes of MPPAA. Under *Barker & Williamson,* the Fund had no obligation to send a copy of the letter directly to defendants or their counsel.

Defendants next argue that the letter cannot be interpreted to give notice to, and demand payment from, Hall's or members of Hall's controlled group. First, according to defendants, the letter is ineffective because it does not state that liability is asserted against defendants. Second, the letter states that the demand is applicable to Tiger but "not applicable to Hall's and other debtor entities to the extent prohibited by the Bankruptcy Code." Plaintiffs respond that the letter exempts Hall's from the demand only to the extent required by the Bankruptcy Code. Plaintiffs also claim that HAC, during negotiations with the Fund, acknowledged that it understood the January 20, 1988, letter to constitute notice of withdrawal liability. Finally, plaintiffs represent that discovery is not complete on the issue of HAC's understanding of the letter.

The Court concludes that there is a genuine issue of material fact as to whether the January 20, 1988, letter constituted effective notice and demand as to the defendants. First, the fact that the letter does not specifically mention the defendants does not render it ineffective. *Barker & Williamson,* 788 F.2d at 128. Second, the Court disagrees with defendants' contention that the letter unconditionally exempts Hall's from withdrawal liability. The letter specifically exempts Hall's only "to the extent prohibited by the Bankruptcy Code." Therefore, the letter can reasonably be interpreted to constitute notice and demand to members of Hall's controlled group. *Cf. Central States S.E. & S.W. Areas Pension Fund v. Slotky,* 956 F.2d 1369, 1376 (7th Cir.1992) (a demand for withdrawal liability payment that would violate the automatic stay provision of 11

U.S.C. § 362 as applied to a bankrupt MPPAA employer "would still be effective against nonbankrupt members of the controlled group"). Moreover, according to plaintiffs, statements made by Bodford and counsel for HAC during negotiations clearly demonstrate that HAC understood the letter to be a demand for payment of withdrawal liability, and additional discovery is needed on this issue.

## VI. Employer Status at Time of Withdrawal

The Court has previously determined that there is a genuine issue of material fact as to whether any defendant was ever a MPPAA employer prior to withdrawal. This threshold issue must be determined by the district court and is not arbitrable.

Defendants' Motion to Dismiss presents a slightly different issue. In their Motion, defendants assert that although there may be an issue of fact as to whether some defendants were *ever* under common control with Hall's, *see, e.g.,* Def.Mem.Opp.Pl. Cross–Motion to Dism. or Stay Pending Arb. at 16 n. 7, they can prove that they were not under common control with Hall's *at* the time of withdrawal and are therefore not liable under MPPAA as a matter of law. Accordingly, the Court must now consider whether defendants can establish as a matter of law that they were not MPPAA employers at the time of withdrawal.

As set forth in Part II.B *supra,* the Court assumes for purposes of the instant Motion that withdrawal occurred at some point in 1987. It is defendants' position that they were not members of a group of trades or businesses under common control with Hall's at any time in 1987.

### A. Brigadier and Bodford

Defendants argue that Brigadier ceased to conduct any business other than winding up the partnership—in other words, that it dissolved—in 1986 and was not a MPPAA employer at any time in 1987. Plaintiffs argue in response that a partnership remains a "trade or business" until at least the final distribution of its assets, i.e., the termination of the partnership, which in Brigadier's case

occurred in October 1987. The legal issue is whether a partnership, dissolved but not terminated, can be considered a MPPAA trade or business.

■ Although, under ERISA, the term "trades or businesses ... under common control" is to be defined in accordance with Internal Revenue Service regulations, neither the IRS regulations, MPPAA, and ERISA define the terms "trade or business." Consequently, the determination whether an entity is a MPPAA trade or business is "an essentially factual inquiry." *See Connors v. Incoal,* 995 F.2d 245, 250 (D.C.Cir.1993); *United Food v. Progressive Supermarkets,* 644 F.Supp. 633, 637 (D.N.J.1986).

The only other court that has faced this precise issue dismissed the plaintiff's claim for withdrawal liability on the ground that the defendant had dissolved, but not terminated, by the time of withdrawal. *Connors v. Incoal Inc.,* 699 F.Supp. 3 (D.D.C.1988), *aff'd,* 907 F.2d 1227 (D.C.Cir.1990). Applying general principles of partnership law, the *Connors* court held that a dissolved partnership winding up its affairs at the time of withdrawal could not be considered a MPPAA employer because, as a general rule, a partnership does not incur new liability after dissolution. The court reasoned that to assess liability against a dissolved partnership whose only business was the winding up of the partnership would not advance MPPAA's goal of imposing withdrawal liability on organizations responsible for the funding of the pension plan. *Id.* at 5.

■ The Court agrees with defendants and the *Connors* court that a partnership does not incur MPPAA withdrawal liability triggered by the withdrawal of another organization where the withdrawal occurs after the dissolution of the partnership and where the partnership's business after the dissolution date is limited to winding up the affairs of the partnership. Under the Pennsylvania Uniform Partnership Act, a dissolved partnership "ceases ... in the carrying on, as distinguished from the winding up, of the business." 59 Pa.C.S. § 351 *reenacted at* 15 Pa.C.S.A. § 8351; Uniform Partnership Act § 29. Thus, the sole business of a dissolved partnership is the winding up of its

affairs. A dissolved partnership remains liable for its preexisting debts, but after the dissolution it generally does not incur liability unrelated to the winding up process. *See North Star Coal Co. v. Eddy,* 442 Pa. 583, 277 A.2d 154, 156 (1971) ("In general a dissolution operates only with respect to future transactions....") (citation omitted); *Connors,* 699 F.Supp. at 4. Applying these principles of partnership law, the Court concludes that a dissolved partnership is not a trade or business for the purposes of the ERISA definition of a controlled group. Thus a partnership that has dissolved and thereby ceased to carry on business other than the winding up of its affairs and that is not itself the contributing employer is not liable under MPPAA as a member of a controlled group.

Plaintiffs' citation of case law in support of the contrary position is not persuasive. *See John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *United States v. McDonald & Eide, Inc.,* 865 F.2d 73 (3d Cir.1989); *Commissioner v. Wayne Coal Mining Co.,* 209 F.2d 152 (3d Cir.1954); *Pacific Coast Biscuit Co. v. Commissioner,* 32 B.T.A. 39 (1935); *Central States. S.E. & S.W. Areas Pension Fund v. Bell Transit Co.,* 22 F.3d 706 (7th Cir.1994). The *Wayne Coal* and *Pacific Coast Biscuit* cases were decided decades before the enactment of ERISA, involve portions of the Tax Code other than 26 U.S.C. § 414(c), and are not relevant. The *McDonald* case, which deals with the issue of the existence of a corporation for tax liability purposes under Title 26, does not touch upon the definition of a trade or business for purposes of § 414(c). The *John Wiley* case, which involves a collective bargaining agreement under the Labor Management Relations Act, is not relevant to MPPAA. *Bell Transit* involves ERISA, but the issue there was whether the failure to post a bond as required under 29 U.S.C. § 1384(a)(3)(A) could trigger secondary withdrawal liability for a seller where the other requirements of 29 U.S.C. § 1384(a)(1) were fulfilled. That issue is distinguishable from the situation where a partnership that is not the contributing organization dissolves itself. In such a situation, the issue is not whether

the dissolution triggers withdrawal liability—clearly it does not—but whether such a partnership can still incur liability for the withdrawal of the related, contributing organization. Plaintiffs also maintain that *Bell Transit* stands for the proposition that a corporation does not "liquidate" until it effects the final distribution of assets; however, the court there declined to decide the meaning of "liquidated" under § 1384(a)(3)(A). *Bell Transit*, 22 F.3d at 710 n. 2.

Finally, plaintiffs assert that 29 U.S.C. § 1405 would be "absolutely meaningless," Transcript at 37, if the Court were to hold that Brigadier's dissolution precludes the partnership from incurring liability for Hall's later withdrawal. Section 1405 limits the amount of withdrawal liability an employer incurs when withdrawing on account of a sale of assets, a liquidation, or a dissolution. Thus, if an employer sells all of its assets and thereby triggers a withdrawal from a multiemployer pension fund, § 1405(a) would provide for the maximum amount of withdrawal liability that the partnership could incur. *See Dorn's Transp., Inc. v. I.A.M. Nat'l Pension Fund*, 578 F.Supp. 1222, 1230 (D.D.C.1984), *aff'd* 753 F.2d 166 (D.C.Cir. 1985). In the instant case, Brigadier's dissolution did not trigger Hall's withdrawal liability. The withdrawal occurred when Hall's, not Brigadier, ceased contributing to the Fund in late 1987. Because Brigadier's dissolution did not give rise to the withdrawal liability, § 1405 is not relevant to the Court's holding.

The Court must now consider whether the present record establishes that Brigadier had in fact dissolved prior to any possible withdrawal date. It is not contested that Brigadier was a partnership formed under the partnership laws of Pennsylvania for the express purpose of leasing seventy GMC Brigadier tractors to Hall's. *See* Pl.Mem. Opp.Mot.Dism.Ex. 9 at 3–4. Under Article X

of the agreement, the partnership was to be considered dissolved upon, inter alia, the sale of the partnership's property and the collection of the net proceeds from the sale. *Id.* at p. 17. Article X further provided that any event leading to dissolution under the Pennsylvania Uniform Partnership Act would effectively dissolve the partnership. *Id.* Under the Pennsylvania Uniform Partnership Act, a partnership is dissolved upon fulfillment of certain conditions, including the termination of the particular undertaking of the partnership. 59 P.C.S.A. § 93.[3]

Defendants maintain that the conditions for dissolution were met in 1986 when the partnership sold off substantially all its assets including the seventy Brigadier tractors. According to the affidavit of former Brigadier limited partner Thomas Fraticelli, Brigadier sold all its property and collected the proceeds from the sales in 1986 because the Hall's bankruptcy had eliminated the raison d'etre of the partnership. *See* Def.Reply Mot.Dism.Ex. 4 at ¶ 2 (affidavit of Thomas Fraticelli). Defendants have also submitted evidence that Brigadier filed its final tax return in July 1987 and distributed its final assets in October 1987.

Plaintiffs have presented what appears to be a copy of a computer printout summarizing Pennsylvania state records with respect to the status of the Brigadier partnership. Pl.Mem.Opp.Mot.Dism.Ex. 21. According to the printout, Brigadier was listed as an "active" partnership as of August 1994.

The Court concludes that on the present state of the record a genuine issue of material fact exists as to the status of Brigadier in 1987. Although the copy of the printout has not been authenticated and, indeed, is marked as not certified, the Court will consider the printout as evidence controverting defendants' representations of the status of Brigadier in 1987.[4] In addition, no evi-

---

3. The Pennsylvania Uniform Partnership Act, Act of Dec. 19, 1975, P.L. 524, No. 155, § 1 *repealed* Act of Dec. 21, 1988, P.L. 1444, No. 177, § 302(e)(1), was repealed in late 1988, but remains relevant for determining Brigadier's status in 1986–87. The Uniform Partnership Act remains in force in other jurisdictions and provides a source for federal common law.

4. Fed.R.Civ.P. 56(e) provides:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or

dence has been presented as to the precise nature of the partnership's activities prior to termination; without such evidence, the Court cannot determine whether the partnership was genuinely winding up its affairs.

### B. Epes Carriers, Inc. and Epes Transport System, Inc.

As plaintiffs aver that discovery is not complete as to ECI and ETS, defendants' Motion will be denied as to those defendants.

## VII. Conclusion

Plaintiffs' Cross–Motion to Dismiss or Stay Pending Arbitration is denied because the Court cannot conclude on the basis of the present record that any defendant was ever a MPPAA employer. Defendants' Motion to Dismiss is likewise denied because it appears that discovery on the issue of employer status has not been completed, and, on the present state of the record, there exist genuine issues of material fact.

parts thereof referred to in an affidavit shall be attached thereto or served therewith.

Although plaintiffs' submission of the computer printout has not been certified and is not attached to an affidavit, the Court may rely on the printout as raising an issue of fact that may ultimately be admissible at trial. *See* 10A Wright, Miller & Kane, Federal Practice & Procedure § 2738 n. 34.